THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KIMBERLY NOVY, Defendant-Appellant.

Fifth District    No. 5—91—0201

Opinion filed August 6, 1992.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

On December 1, 1989, 4½-year-old James Novy died as a result of acute swelling of the brain, leading to unconsciousness and cessation of respiration and heart function. At the time of his death, James was covered with bruises, his skull was fractured in two places and he had numerous internal injuries. All of the injuries were caused by some kind of forceful blunt trauma.

On January 12, 1990, defendant, Kimberly Novy, was charged by a three-count bill of indictment with the offenses of first-degree murder, aggravated battery to a child and cruelty to a child, all relating to the death of James Novy. Defendant was the stepmother of the decedent, having married James' father, Keith Novy, the day before James died. She had lived with Keith and James Novy and James' brother, Johnny, from March 18, 1989, until James' death on December 1, 1989.

Following a jury trial in the circuit court of St. Clair County, held January 7 through January 22, 1991, defendant was found guilty on all three counts. With respect to the first count, first-degree murder, the jury was instructed on the offense of involuntary manslaughter and on the theory of accountability for the actions of Keith Novy.

On March 12, 1991, defendant was sentenced by the circuit court of St. Clair County to be incarcerated in the Department of Corrections for a period of 30 years for the offense of first-degree murder. While judgment was entered on the other two counts, no sentence was imposed.

Defendant raises three issues on appeal. She argues that the State failed to prove her guilty beyond a reasonable doubt of first-degree murder and proved her guilty only of involuntary manslaughter, because the defendant's statements to the police are not sufficient to prove that she inflicted any injury to the decedent or intended to cause great bodily harm to the decedent and the defendant cannot be held accountable for the actions of Keith Novy. She asks that her conviction be reduced from first-degree murder to involuntary manslaughter. Defendant also argues that she was denied a fair trial because the circuit court allowed into evidence and allowed the jury to view gruesome autopsy photographs of the deceased. She asks that her conviction be reversed and that this cause be remanded for a new

trial. Finally, she argues that if her conviction for first-degree murder is affirmed, this court must vacate the judgments entered by the circuit court on the lesser-included offenses of aggravated battery to a child and cruelty to a child.

The following evidence was adduced at trial. Natalie Lantz testified that she is a dispatcher for the City of O'Fallon police department. At approximately 4 p.m. on December 1, 1989, she received a telephone call requesting an ambulance. The caller stated that she had a 4½-year-old son who had heart problems. He had wet his pants, and the caller had spanked him and sent him to the bathroom. He fell and was unconscious. The caller's voice was very calm and matter of fact and she spoke at a normal speed. The caller's voice was almost emotionless. Lantz dispatched an ambulance and, as is routine, a police officer, to 205 S. First Street, Shiloh.

Barbara Whitaker Portz works for the O'Fallon/Shiloh Valley Ambulance Service as a paramedic. At approximately 4 p.m. on December 1, 1989, Portz responded to a call for an ambulance. The call reported that there was a boy with heart problems that was unconscious. Portz and the ambulance proceeded to 205 S. First Street, Shiloh, taking about five minutes to get there. Portz observed a woman standing on the porch outside, holding the door open and waving for them to come inside. Portz identified the defendant as this woman.

Portz entered the home and observed a small child lying face up on the couch. He was dressed in a diaper. The boy had vomit covering his mouth, filling his mouth and in his nose. The vomit on the outside of the mouth was dried and appeared to have been there for a while. The boy's whole mouth was full of vomit. Portz cleaned out the boy's mouth and started mouth-to-mouth resuscitation. He had no pulse and his pupils were dilated, meaning that his brain had been without oxygen for a long period of time. Portz carried the child out to the ambulance, continuing mouth-to-mouth resuscitation. The child vomited red jello on the way to the ambulance and on the way to the hospital. Once in the ambulance, the paramedics began cardio-pulmonary resuscitation, or chest compressions, on the child.

Portz noticed that the child's body had numerous bruises all over it. There was a scab on the child's forehead and a scar on his chest from a previous surgery. There was bruising around the eyes and behind the ears.

Portz did not notice that defendant showed any emotion. Defendant did begin to cry when Portz carried the child out of the house.

When Portz arrived, the child's body was cold. When Portz first entered the house, the defendant told Portz that the child had choked on jello. Portz estimated that the child weighed between 20 and 30 pounds.

Kenneth Baker testified that he also works for the ambulance service in O'Fallon. He responded to the emergency call with Portz at 205 S. First Street, Shiloh. As he was bringing equipment into the house, the woman who met them there told Baker that she was the child's stepmother. This woman told Baker that the child had gotten up to go to the bathroom and had collapsed and urinated in his pants. The child had been unconscious for three minutes before the woman called the ambulance. The woman further told Baker that she had been doing cardio-pulmonary resuscitation (CPR) on the child. The woman volunteered that the Department of Children and Family Services (DCFS) was aware of the bruising around the child's eyes and that it was caused by the child sucking his thumb and digging his fingers into his eyes. Once the child was in the ambulance, Baker noticed bruising over the child's whole body, with some bruising to the eyes and behind the ears. Baker testified that in order to do effective CPR, any vomit would have had to have been cleared out of the mouth.

Brad Moessinger was the third ambulance attendant who responded to the emergency call in question. He noticed a cigarette burning in the ashtray on a table next to the couch where the child was lying. The cigarette was burnt approximately one-quarter of the way down. It looked as if the ash had been flicked off.

Moessinger noticed a scab on the child's forehead and a scab under his chin. The woman who met the ambulance appeared to be calm and was not out of breath.

Norris Lutz is a police officer for the Village of Shiloh. At approximately 4 p.m. on December 1, 1989, he responded to a police call at 205 S. First Street, Shiloh. He arrived right after the ambulance did. He approached a white female, identified as the defendant, standing in the front yard, who said that her son was inside on the couch. Defendant told Lutz that she had a cigarette lit inside and that she wanted it. Lutz told her no and escorted her towards the kitchen so the ambulance personnel could work on the child. Lutz noticed bruises on the child's upper forehead and black eyes.

Paul Westerman testified that on December 1, 1989, he was working in the emergency room at Scott Air Force Base hospital. At approximately 4 p.m. a small boy was brought by ambulance to the emergency room. Westerman, a medical service technician, assisted in

treatment of the child. The child appeared lifeless. After the child was pronounced dead, Westerman looked at the child's body. He noticed bruising around both eyes and "battle signs" or bruising behind the ears at the base of the skull. Westerman noticed that defendant, who was present in the emergency room, seemed to lack any emotion and did not react to the news that the child had died.

Robert Paschall is a medical doctor specializing in pediatrics. The court found Paschall to be an expert in the area of pediatric medicine. On December 1, 1989, Paschall was working at the Scott Air Force Base hospital. He arrived in the emergency room just as resuscitation was begun on the child. He spoke with the defendant. Defendant told Paschall that the child had been eating jello at the kitchen table. Defendant noticed that the child had soiled his pants with urine and sent him to the bathroom to change and clean himself up. As he was walking to the bathroom, the child fell back and hit his head. That was the cause of his condition.

Paschall felt that the condition of the child did not coincide with what defendant told him. Paschall noticed bruises on the child that were several days to a week or two weeks old. It would also be unusual for a child to fall backwards and hit the back of his head. When Paschall questioned defendant about this, defendant simply responded that that was what had happened. Paschall asked defendant about the injuries on the child's back, and defendant said she did not realize they were there. Defendant told Paschall that the bruises around the child's eyes were being investigated by DCFS. Defendant told Paschall that she had initiated resuscitation on the child. Paschall testified that defendant seemed to be somewhat hysterical in the sense that she did not seem to hear or understand what Paschall said to her and she repeatedly asked the same questions.

Dr. Harry Parks, an expert in pathology, testified that he performed the autopsy on James Novy, the victim. He observed that the child was not as well developed as he should have been for his age. The child was not well nourished, and there were numerous bruises on the body. Parks identified People's exhibits 81 through 92 as a series of pictures which were taken during the autopsy of James Novy, showing various views of the body both external and internal. These photographs show the body as it appeared at the time of and during the autopsy. While defendant did not object to their admission into evidence, she did object to their being shown to the jury for the reason that they were cumulative of Dr. Parks' testimony. The court allowed the pictures to be shown to the jury, overruling defendant's objection.

On external examination, Parks noted two large black eyes, a small laceration of the forehead and another below the chin. The left shoulder had three bruises that were spread about a hand span across the shoulder. The bruises around the eyes were very recent, probably incurred in the past 24 hours. The bruises on the shoulder were a little older, probably three or four days older than the eye bruises. Both legs had several bruises, five or six per leg, mostly on the shin bones. There were some older injuries to the child's back. They looked like abrasions or lacerations that were in the healing phase. Some were only a day or two old and others a week to 10 days old.

After his external examination of the body, Parks opened the body with an incision and did an internal examination. The child's liver had a large bruise or contusion on its surface which had started to heal. The pancreas had a large bruise which had started to heal. In the small intestine, several loops were stuck together from healing from some type of injury. The bowel had a bruised appearance. Parks found a number of bruises underneath the child's scalp, about five or six on the front and five or six on the back. These bruises are a hallmark of child abuse because the only way they are caused is by the child being lifted by the hair. This breaks small blood vessels under the scalp between the skull and the covering of the skull. These bruises were very recent, within 24 hours of death.

The child's brain was very swollen and had several bruises on it. There was also a blood clot evidencing a closed head injury as a result of blunt trauma to the head. An X ray of the left leg showed a healed spiral fracture of the femur or thigh.

The autopsy further showed that the child had been deprived of oxygen as a result of acute swelling of the brain. The injury to the liver was approximately five days old. The injuries to the intestines had occurred in two or three separate episodes at a period of around 10 days, 15 days and 20 or 21 days before death. The stomach, small intestine and colon were empty of any food or fecal material. The child had not eaten for probably at least 24 hours before his death. The bruises on the skull were very recent, within 24 hours prior to death. The blood clot in the brain was at least 24 hours old. The bruises to the brain were of different ages. Some were less than five days old, others were more than five days old. There were at least two episodes of blunt trauma to the head, one about 24 hours prior to death and one five or six days prior to death. Thus, there were multiple episodes of trauma to different parts of the body ranging from a few hours to days to weeks apart.

Dr. Parks found the immediate cause of death to be acute swelling of the brain which shut down certain vital centers like respiration or breathing. The child would lose consciousness and stop breathing. The acute swelling of the brain was due to the same blunt traumas that caused the bruises and blood clot in the brain. The other injuries in the liver, pancreas, small intestine and legs would not, by themselves, have been fatal. Blunt trauma is caused by something that has no sharp edges. It could be a club, a hand, a floor, or anything that causes an injury without cutting or breaking the skin.

On cross-examination, Parks testified that the bruising to the eyes and behind the ears would not have been caused by a skull fracture to the base of the skull, but only by a trauma to that particular area. While a broken nose might cause the black eyes, Parks saw no evidence of a broken nose. A blow to the base of the skull would not cause the black eyes. It is possible that the day before his death the child received a severe blow to the head and on the day of his death he was walking and fell and hit his head. Brain swelling would affect coordination and might cause stumbling, falling or loss of consciousness. The fact that the child had had a problem with his heart, which was corrected when he was two years of age, might impede his physical development but only up to the point in time that it was corrected.

Black eyes are associated with a blunt trauma to the area around the eye, most commonly by being struck by someone's fist. The child was thin and had little or no fat on his body.

Jody Brown testified that her child had the same babysitter, Sonya Cordes, as the victim in the spring of 1989. On one occasion, when Brown went to pick up her child, Cordes asked her to look at a bruise on the victim's face. It appeared to be an adult handprint on the side of the victim's face, which went up into the hairline. Also, behind the child's ear the skin was very dark, like a dark bruise. On the other side of the head there was a scratch and a light bruise behind the ear.

Clyde Carmichael, a medical doctor, testified that he treated the victim. He first saw the victim on November 14, 1987, for a stuffy nose and sore throat. He saw the victim a total of 13 times, the last time being October 5, 1989. He saw James on September 15, 1988, and February 2, 1989. Carmichael did not notice anything unusual about the child. However, in September 1988, when the child was brought in by his father, Carmichael noticed that the victim, his brother Johnny and his father all had poor personal hygiene. They were dirty and there was the smell of urine. Later, when the victim

was brought in by defendant in October 1989, his hygiene had improved.

James Donahoe, an expert in pediatric cardiology, testified that he treated James Novy for a congenital heart defect consisting of a hole between two chambers of his heart. Dr. Donahoe saw James twice, in a diagnostic capacity. He recommended an initial surgery to temporarily improve James' condition. A later corrective surgery was performed. Once this corrective surgery is performed, the patient's prognosis is usually excellent.

Sue Chen is a pediatric cardiologist who treated James Novy. When James was one year old, he had the initial palliative surgery. When James was two years old, he had surgery effecting a total repair of his heart defect. Following surgery, there would be no limitation on the patient's activities. James suffered no complications from the surgery. James' first surgery was performed on March 27, 1986; the second surgery was performed on May 27, 1987.

On cross-examination, Chen stated that following James' second surgery, he did not gain weight as she had expected. Chen thought that James suffered from "failure to thrive." On redirect examination, Chen explained that failure to thrive is simply a descriptive term for someone who does not gain weight properly. The condition can have many diverse causes ranging from poor nutrition to psychosocial causes. James' weight did improve between 33 and 36 months of age but never really pushed up into the normal range.

Mary Lou Arterburn Haas is an early childhood special education teacher who taught James Novy in 1988. Neither of James' parents appeared for James' staffing or evaluation in September 1988, so it was held without them. Haas observed that when James started the program he was a very withdrawn child with very little language skill. He grunted a lot and pointed to things. He also had a very noticeable tremble. Between October 3, 1988, and April 4, 1989, James was absent 41 days. James was a very frail little boy. Haas was concerned enough about him that she spoke with the social worker at the school, Mike Inyart. James was not toilet trained. He had a hard time controlling himself at snack time and was unable to wait for the other children to begin eating. He often put whole cookies in his mouth. Many times James came to school with a wet diaper and he would smell bad.

On April 3, 1989, while assisting James in the bathroom, Haas noticed marks on his buttocks like bruise marks going across his bottom. They were linear bruises, dark red in color. There were three or four of them. Haas had James taken to the nurse and the principal. James

returned to school the next day, April 4, but never came back again. He was informally withdrawn from the class. It was Haas' opinion that if James had been receiving adequate care and love at home he would have developed normally.

Lorraine Fenoughty was the school nurse at James' school. She recalled being summoned in February 1989 by James' teacher, who suspected that James had been abused because of the way his bottom looked. When Fenoughty looked at it, she told Haas that she thought it was diaper rash. On April 3, 1989, Haas again asked Fenoughty to examine James' buttocks. James had linear marks at a slant, three on one buttock and four on the other, that were dark red. It looked as if the child had been hit with something approximately one-half to one inch in width, such as a belt, ruler or stick. The marks were approximately three inches long. Fenoughty immediately took James to the school principal, Lonnie Smith.

Fenoughty also testified that she did not receive from James' parents a record of the State-required physical examination and immunizations. After several letters were sent home with James, Fenoughty still did not receive the records. On April 10, 1989, Fenoughty sent James' parents a letter stating that he would be excluded from school if the records were not received. However, James was never excluded because he never returned to school after April 4, 1989.

Lonnie Smith was the principal at James' school. In early April 1989, James was brought to him by the school nurse. Smith observed linear bruises on James' buttocks. He called the DCFS hotline. A few days later, James was withdrawn from school.

The State's next witness was Dean Fogle. He is the school administrator for the Belleville Area Special Education District. One of the district's responsibilities is to provide transportation to and from school for special education students. A problem arose with James Novy because he sometimes would not be at home when the bus arrived to pick him up and his parents sometimes waved the bus on or called and told the district not to send the bus. This problem first arose in October 1989. James was not attending school and the district staff wondered whether to continue sending the bus for him. The staff was directed to continue going for James. In November 1989, some of the staff were discussing whether to call the DCFS hotline regarding James Novy.

Camille Powell is a bailiff in the St. Clair County courthouse. On November 30, 1989, she was present in court when defendant and Keith Novy appeared before a judge to be married. The two Novy children were present. The older of the two children was leaning over,

laying his head down like he was going to sleep. Later, during the marriage ceremony, Powell waved and smiled at the child but got no response. The child had two dark bruises under his eyes. The child never moved or spoke and seemed pale and thin.

Pamela Bequette was also present at the marriage of defendant and Keith Novy. She noticed one of the children with the Novy party. He was kind of lying with his head on his arm like he was sick or did not know what was going on. This child was carried up to the bench when the ceremony was performed. He was very "puny," white-looking and with very black eyes. He looked like he was very sick and did not know what was going on. The child was very thin.

Rebecca Huntsman testified that she is a neighbor of Sonya Cordes. In May 1989, Cordes asked Huntsman to come to her house to look at a child Cordes was babysitting. Huntsman went and saw a little boy with a very bad bruise that looked like a handprint on the side of his face. Huntsman also noticed bruises on the child's back and scarring. She also saw bruises that are known as battle signs behind the child's ears. Huntsman identified the child as James Novy.

Cynthia Guthrie testified that she lived near the Novy home. She babysat between February 1989 and December 1989. She sometimes saw James Novy going in and out of his home and sometimes observed him fall. He never seemed very steady walking. He often stumbled, tripped and fell. He would then crawl the rest of the way to the truck or house. In July 1989, Guthrie observed James with a cast on his leg. On this occasion, Keith Novy carried James from the truck to the porch of the house. James was crying. Keith sat James in a wheelchair on the porch and went inside, leaving James crying outside. James was left on the porch crying for about one hour. The defendant was present on occasions when James would have to crawl to the house or truck.

Garnet Warchol also lives near the Novy home. Between February 1989 and December 1989, she never observed the Novy children playing outside.

Joseph Jorn also lives near the Novy home. His house is about 10 feet from the Novy's front porch. Jorn could see directly onto the Novy porch. He observed Keith Novy put James out on the porch with a suitcase. He did not see the defendant. James was in his underpants and told to get going on his way. Keith went back into the house. The child was there for approximately 30 minutes. He then crawled and walked out to the street, dragging his suitcase with him. On one occasion, Jorn observed the Novy family return home and enter the house. James had a cast on his leg. James was forced to crawl

up to the door and knock on the door of the house. Someone opened the door for him. Defendant was present on this occasion. In November 1989, Jorn observed a woman come to the Novy residence and knock on the door. Jorn knew that defendant was inside the house. Defendant did not open the door for the woman and the woman left.

Thomas Jorn is the son of and lives with Joseph Jorn. He corroborated the testimony of Joseph Jorn regarding James being left on the Novy porch on July 3 or 4, 1989.

Barbara Perryman is a registered nurse employed in the emergency room of a Belleville hospital. On July 14, 1989, Perryman was working in the emergency room. At 11:08 that morning, James Novy was brought in by his parents, who stated that James had fallen out of a bunkbed and injured his right upper leg. Perryman observed that the child also had bruising on the left side of his forehead, on the right forehead and on the top of the right foot. He weighed approximately 27 pounds, as reported by his parents. The Department of Children and Family Services was called, and the child was transferred to Cardinal Glennon Hospital.

Shielah Glaze is a medical-social consultant at Cardinal Glennon Children's Hospital. She has a bachelor's degree in psychology and a master's degree in social work. On July 14, 1989, James Novy was brought into the emergency room at Cardinal Glennon Hospital with a possible diagnosis of child abuse due to a fracture of his femur. Glaze spoke with Keith Novy and with the defendant. She learned that defendant had been home alone with the child at the time the injury occurred. Defendant stated that the child had fallen out of the top bunkbed and caught his leg on the bed railing. Glaze also saw James and observed two bruises to his forehead.

Elizabeth Beckman works at Cardinal Glennon Children's Hospital with children with orthopedic problems. She is a nurse in a supervisory position. In July 1989, she worked with James Novy regarding his fractured femur. James' leg was placed in traction, and he remained in the hospital for three weeks. James was then placed in a cast. James was discharged on July 29, 1989. On August 4, 1989, James was brought back to the hospital for examination and treatment. The skin under his cast was very macerated, blistered and red. It looked like the cast had been wet from urine and the urine-soaked cast was macerating the skin. James' cast was removed, and because the skin was so damaged, a new cast could not be applied. James was placed in traction again. He remained in the hospital until August 15. A new cast was put on on August 10. During James' second admission to the hospital, Beckman telephoned defendant on August 8.

Beckman advised defendant of a residential-care unit which could care for James while he remained in the cast. Defendant explained that she was suffering from health problems herself and had been instructed by her doctor not to do any lifting and to remain in bed. Defendant was receptive to the idea of placing James in the residential unit. Defendant seemed relieved at the idea but wanted to check with Keith Novy. Defendant called Beckman back and told her it was alright. James was placed in the rehabilitation center.

On September 1, 1989, Beckman received a telephone call from a social worker at the rehabilitation center stating that defendant and Keith Novy had checked James out of the center against medical advice. On that same day, James came into Cardinal Glennon to have his cast removed, as scheduled. James was scheduled to return in three weeks but did not. He next returned on October 20. He was walking and appeared to be doing okay.

Grace Spinner is a registered nurse at Cardinal Glennon Children's Hospital. She was James' nurse when he was admitted in the summer of 1989. James was a good eater.

Marie Rudy had worked with Keith Novy at Marsh Stencil Company in Belleville beginning in May 1989 and through most of 1989. A couple days before James Novy died, she observed James when defendant came with the children to pick Keith up after work. James had a black eye and was leaning against the car door. Rudy only saw James' left side and noticed the black eye on that side.

Sheree Armstrong testified that she also worked with Keith Novy at the Marsh Stencil Company throughout 1989. She cut James Novy's hair at her home in the fall of 1989. James was undernourished and dirty, and he smelled. His hair was dirty and matted. James was carried into her home and she never saw him walk. He was losing his hair; there were small areas all over his head where the hair was gone. When Armstrong approached James to comb his hair, he flinched or jumped, like he was afraid of her. Armstrong gave James a bag of candy, which he gulped down. Armstrong saw James the Wednesday before his death. He was sitting in the truck waiting for his father to come out of work. He looked like a rag doll, he had a black eye and the side of his face was purple.

Ronald Pearson is chairman of the department of emergency medicine at Scott Air Force Base. He was present at the emergency room at Scott Air Force Base hospital in December 1989 when James Novy was brought in. James was entirely unresponsive and had no heart rhythm at all. He had multiple areas of bruising about the body. He had bruising around the eyes, called raccoon eyes, and behind the

ears, called battle signs. He had a series of bruising on some of the upper extremities as well as the lower back. He was very malnourished.

Jan Zeller works for the busing company that transports special education students in St. Clair County. Between February and December 1989, Zeller was the dispatcher. She would receive telephone calls from parents telling her that their child would not be riding the bus on a particular day. She would then inform the drivers by radio that they did not need to pick up a certain child. She kept a record of all calls received from parents.

On October 5, 6, 13, and 26 and November 1, 7, and 8, 1989, Zeller received telephone calls from the same woman who stated that James Novy would not be riding the bus. On October 19, 1989, a Thursday, the same caller stated that James would not be riding the bus until Monday. On November 13, a Monday, the caller stated that James would not be riding on Monday or Tuesday. On Wednesday, the woman called again and stated that James would not be riding until the following Monday. On that following Monday, the woman called and stated that James would not be riding all that week because the caller was in the hospital. On the following Monday, the woman called again and said James would not be riding because she had had surgery. The caller stated that James was living with an aunt out of State and would not be riding the bus until the woman further notified the bus company.

Jacqueline Engel was the bus driver that picked up James Novy for school. She picked James up at his home at 11:45 a.m. beginning at the end of September 1989. When she arrived at his home, Engel would beep the horn and either James would come out or his stepmother would bring him out. If James did not come out of the house after three beeps, Engel would go on without him. Many times Engel was told over the radio not to go pick up James. On October 10, 1989, while helping James to fasten his seat belt on the bus, Engel noticed a bruised area above the buttocks area. It looked like four fingers right in the small of his back, above his buttocks. On October 16, 1989, Engel noticed that James' left eye was bruised all the way around and back into the hairline. The next day when Engel asked James' mother what had happened, she stated that she had taken James to the doctor for an eye infection and that James was supposed to keep an ice bag on his eye to control swelling. On November 27, 1989, Engel went by for James. James' mother came out and stated James would not be riding because he was at his aunt's house out of

State. Engel identified defendant as the woman she saw when she picked up James at his home.

Len Morrison was also a bus driver for School Services and Leasing. November 29, 1989, he went to the Novy home to inform them that he would be Johnny's (James' brother) bus driver and would be picking him up. When Morrison got out of the bus and started to approach the house, defendant came running out of the house wearing no shoes and a thin nightgown. He was told that the children were at their grandparents' home in Missouri and would not be riding the bus for a while. Defendant told Morrison to leave.

Pam Huggins is director of social service at the rehabilitation center where James was sent with his fractured femur. She met James Novy on August 15 when he was admitted. James appeared underweight. Because of his cast he could not walk and had to be carried. James was not accompanied by either parent. James was pretty withdrawn. Neither parent ever attended any of the conferences scheduled to discuss James' prognosis and treatment. On August 26, 1989, Huggins learned that James' parents had taken him out of the center against medical advice. On August 27, 1989, Huggins called the Illinois Department of Children and Family Services because, when a child is taken out of the hospital against medical advice, law mandates that DCFS be notified.

According to Huggins, James appeared to have developmental delays, he had some tremors, unusual shaking and stiffness. Consequently, it was decided at the rehabilitation center that James should be examined by a pediatric neurologist. This decision was made on August 22. Keith Novy refused to consent to the examination. This was one of the reasons James was removed from the center against medical advice.

Doreen Renshaw also works at the rehabilitation center where James was a patient. She was a shift supervisor but also took care of James at times. She recalled one occasion when Keith Novy and defendant came to visit James. She also saw Keith Novy and defendant on the evening James was discharged against medical advice. Defendant came to Renshaw's office and expressed that they were upset that James' hair had been cut without permission. Renshaw apologized. Defendant stated that she had been unable to come and visit because of health problems, but that they had been calling twice a day to check on James and that the staff did not seem to know what they were doing. Defendant seemed very upset. Defendant told Renshaw that they wanted to take James home immediately. Renshaw informed defendant that Keith Novy would have to sign a form authorizing the

discharge and that sometimes insurance companies would refuse to pay for a hospital stay if the patient is discharged against medical advice.

Sarah Leininger Jones is a physical therapist who treated James at the rehabilitation center. She saw James twice a day during his stay for approximately 45 minutes each session. Jones had noticed that James had some coordination problems. She worked on these and also on teaching James to crawl with the cast on and gaining endurance to do so. When James was admitted, he did not have any shoes. Jones attempted to contact the parents to obtain shoes but was unable to do so. She purchased shoes for James so that he could work on his walking in the cast. James had tremors in both hands and feet which were more common when James was concentrating on some task. Neither Keith Novy nor defendant ever appeared for any conferences. James was not ready to be discharged when he was removed from the center.

Jones participated in making the decision that James should have a neurological examination. The decision to take the child out of the center against medical advice must be made by the natural parent of the child.

Geri Tyrey is a recreation therapist at the rehabilitation center. She worked with James Novy. She met with him at least once a day, sometimes twice a day. She also saw him in the evenings and on weekends. Her sessions with James lasted 30 to 60 minutes. James' hair was quite long; it hung down over his eyes and down past his neck in back. He did not have very good eye contact. He was short tempered and used foul language. He threw things and had a short attention span. In groups, he did not have the social skills to interact with the other children. James had hand tremors and often dropped things. Neither Keith Novy nor defendant attended any of the conferences concerning James. James was not ready to be discharged when he was removed from the center. James appeared to be developmentally delayed.

Mary Reilly is an occupational therapist at the rehabilitation center and worked with James Novy. She met with James twice a day for 30 to 40 minutes. She had no contact with either Keith Novy or defendant. James suffered from hand tremors, especially with higher-level coordination tasks. James appeared to be developmentally delayed.

William Brown was next to testify for the State. Defendant is his sister-in-law. He spent Thanksgiving 1989 with defendant, Keith Novy and Keith's children at the home of defendant's mother. Jimmy Novy

had two black eyes. In the summer of that same year, Brown had seen a bruise on Jimmy's left leg, just above the knee. James never seemed to have a lot of energy. He seemed "kind of sickly" all the time. He appeared slightly tired.

Diane Honerkamp is an administrator at the Belleville Area Special Education District. Her first contact with the Novy family came in 1988 when Keith contacted her seeking services for his son, James. James was placed in the special education preschool program at Belle Valley School. James was withdrawn from the school after the school had turned in a possible abuse situation. After two or three weeks of nonattendance by James, he was dropped from the program. Keith Novy informed the school that he would not send James anymore. That was in April 1989.

On cross-examination, Honerkamp testified that she first met Keith Novy and his two children in October 1988 at a parenting program. Both boys were unkempt and smelly from urine in their diapers. In the fall of 1988, Keith missed a staffing conference concerning James.

Sonya Cordes baby-sat for the Novy children beginning May 19, 1989. When she first met the Novy children, in the presence of Keith Novy and defendant, the children were very quiet and seemed a little slow. The first day she baby-sat for them, they arrived without having had breakfast. Cordes fed them and they could not eat enough or fast enough. The same was true the second and third days. On the third day, however, Cordes noticed a bruise on James' cheek and bruises behind both ears. Cordes asked her neighbor, Rebecca Huntsman, to come over and look at the bruises. The bruise on the cheek was in the shape of a hand. Cordes reported the bruises to DCFS.

Lora Handy works for the Belleville Area Special Education District as a school psychologist. On October 16, 1989, she made a visit to the Novy home to evaluate Johnny for the preschool program. She observed that James Novy had a reddened area around his left eye.

Handy reviewed records on James Novy in fall 1988. James was developmentally delayed in that he had a speech and language impairment. He also displayed delays in other areas, such as motor, self-help and cognitive skills. Such developmental delays could be caused by a number of factors, including prenatal insult, neurologic or brain damage, or lack of stimulation in the environment.

Michael Inyart, the social worker for the Belleville Special Education School District, testified that on November 13, 1989, defendant called him to report that James would be out of school for a few days to attend a funeral in Missouri. On November 15, James was not in

school, so Inyart called defendant to inquire. Defendant stated that James was throwing up and would not be able to attend school. When asked if she had taken James to a doctor, defendant responded no. On November 28, 1989, Inyart went to the Novy home at approximately 10:30 a.m. He did not enter the home but talked with defendant on the porch. Inyart was concerned about James' lack of attendance at school. Defendant stated that she was suffering from health problems and that she was unable to watch the children and get them to school. Later that night, when he got off work, Inyart returned to the Novy home. No one answered the door and he waited 45 to 60 minutes for someone to come home. No one did. Inyart was suspicious about James' whereabouts. The next day, defendant telephoned Inyart to state that she had scheduled a counseling appointment for James for December 12. After speaking with his supervisor, Inyart called the Department of Children and Family Services. The next day, November 30, defendant telephoned Inyart and told him that the children would be in school the next Monday. On the day James died, defendant again called Inyart and told him that Keith's mother must have turned them into DCFS because Keith's mother was the only one to see a mark on James' face on Thanksgiving day.

Linda Potter is a teacher at the school James attended in 1989. James started school September 27, 1989. James walked with a noticeable limp and had difficulty getting off the bus. His height and weight were below average. He appeared to have had his hair combed and to have been bathed. On James' first day, he had a bruise on his upper left arm. It was like a bite with a bruise around it. In James' book bag that day was a note, purportedly from defendant, explaining that James had said the bruise was caused when he fell out of bed but that defendant did not know how he had gotten it. On October 3, Potter noticed a bruise on James' forehead. Included in James' book bag was a note from defendant explaining that James had fallen that morning and hit his head. There was a little red spot on his forehead. On October 11, James had bruised knees and a bruised chin. Defendant telephoned Potter that morning complaining that James had a deep bruise on his back and it had happened at school. Potter stated that she was unaware of any injury occurring at school. When James arrived at school, Potter looked but did not see a bruise on his back. There were, however, bruises on his knees and chin. On October 12, James brought a note to school explaining that he could have received those bruises from a fall or he could have hit his chin when he was getting down from the table. On October 16, a Monday, James came to school with discoloration around his left eye. It was not a bruise,

but looked more like pinpricks or redness that indicated some sort of trauma to the orbit around his eye. Defendant had sent a note stating that James had awakened the previous Friday with his eye swollen shut. He had a scratch and bruises all around it. James said he hit it on the bed, but defendant thought he had gotten something in it and scratched it. James was absent several days and then returned to school on October 25 with a bruise on his head and some scratches on his hand. Defendant explained that James had fallen down some stairs and had been scratched while playing with a dog. On November 6, James had a bruise on his forehead and some blood on his nose and a trace of blood near his lip. The note from home stated that he had fallen in the bathroom because it was wet. He had slipped and fallen face down and had bloodied his nose and gotten a bump on his forehead. Potter took James to see the nurse. James' temperature was slightly elevated. They looked for other bruises but found none. Later, he started to vomit. Potter called defendant, who stated that the toilet had been leaking and James ran into the bathroom and fell. Defendant came to pick James up when she learned he was vomiting. That evening, Keith Novy, defendant and both children came to a conference at the school. Defendant stated that she had given James some medicine and she thought he just got sick to get attention. James began to play with his brother. Later that evening James became sick and threw up a couple of times. Potter never saw James again.

Potter testified that James had a limp in his left leg. He had a hard time getting up and down when sitting on the floor and had a hard time climbing onto things.

On cross-examination, Potter testified that in her conversations with defendant, defendant seemed to be genuinely concerned about the children. The discoloration around James' left eye visible on October 16 appeared to Potter to be an allergic reaction.

Cathie Gimber works at National Food Store. The day before Thanksgiving 1989, Gimber observed Keith Novy with his two sons and defendant in the checkout lane. She noticed one of the children sitting in the cart motionless. He looked pale and both eyes were black. He had bruises down one side of his face. His arms were hanging down and his head was hanging. Gimber tried to make eye contact with him but he would not look at her. She never heard him make a noise or saw him move. Gimber asked a couple of checkers to look at the child and give her their impressions. Gimber was concerned for the boy's health. She called DCFS.

Sandra Burgess was one of the checkers at the National Food Store. The day before Thanksgiving 1989, she waited on people with a child in a grocery cart who had been beaten or bruised. The child had big dark circles around his eyes. He never said anything. She smiled at him, but he did not look at her. He did not move.

Charles Brueggemann is an Illinois State Police officer with the Division of Criminal Investigation. On December 1, 1989, he was assigned the investigation of the death of James Novy. On the evening of December 1, he met with Shiloh Police Department Chief Kent Meyer. Meyer told Brueggemann that hospital personnel at Scott Air Force Base had called him to report that James Novy had died and they suspected child abuse, possibly trauma to the head. At approximately 10:10 that evening, Brueggemann and Chief Meyer went to the Novy home to ask defendant and Keith Novy to come down to the police station to be interviewed regarding the death. Defendant and Keith agreed to do so and met the officers there. Brueggemann and Meyer interviewed defendant. Forty-five minutes into the interview, defendant was advised of her constitutional rights to an attorney and not to incriminate herself. Meyer and Brueggemann had learned from Scott Air Force Base hospital personnel that the child had probably suffered and died from child abuse. The officers did not know who had had access to the child during that day. Defendant indicated that she had been with the child all day. Accordingly, she was considered a suspect. Defendant waived her constitutional rights and agreed to talk with the officers. Defendant agreed to give a written statement. Later that evening, Brueggemann, Meyer, Keith Novy, defendant and Illinois State Police crime scene technician Dee Heil went to the Novy house to take photographs.

Brueggemann attended the autopsy the following morning. That evening, December 2, Brueggemann again interviewed defendant at the Division of Criminal Investigation headquarters. After being advised of her constitutional rights, defendant agreed to the interview. Defendant was asked whether she or Keith had used any form of physical punishment on James. Defendant initially denied it but then began to cry and said she did not want to go to jail. She stated that the reason she had not told the truth was because she did not want to be charged with murder. Defendant stated that she did spank James on the butt. She further stated that she had used a belt on James and that she had hit James lightly on the face. Defendant agreed to give a written statement. Following this statement, Brueggemann proceeded to the Novy home where he took certain items into evidence. Other

items were taken from the house over the course of the next few days.

On cross-examination, Brueggemann testified that during the initial interview with defendant on December 1, she was very matter of fact and showed no remorse. She showed no emotion at all.

Kathy Wittmeyer works for Traveler's Insurance as a case manager. She is a nurse who receives referrals regarding patients in hospitals. She assists in setting up home care services. On August 17, 1989, Wittmeyer telephoned defendant because she had learned that James Novy had been admitted to a hospital with a fractured femur and was being considered for admission to a rehabilitation center. Wittmeyer was to determine whether such care was appropriate. Traveler's Insurance provides administrative services for the Marsh Stencil Company, Keith Novy's employer, for handling payouts for insurance. In their telephone conversation, defendant told Wittmeyer that she could not care for James at home because she was not feeling well. She had some medical problems. Wittmeyer asked defendant to have Keith Novy contact her. Keith never called.

Wittmeyer spoke with defendant on the telephone again on August 24, 1989. Defendant stated that Keith had told her to call Wittmeyer and ask her to say that Traveler's Insurance would not pay for the neurological examination recommended by the rehabilitation center. Wittmeyer responded that she could not do that because Traveler's Insurance would pay for the examination if it was necessary. Wittmeyer told defendant that parents had a right to refuse an examination if they thought it was not necessary; however, she recommended that defendant allow the examination and see what the results were.

On August 29, 1989, defendant again telephoned Wittmeyer to inform her that on August 26 she and Keith had taken James out of the rehabilitation center against medical advice. On September 1, defendant telephoned Wittmeyer to tell her that they had taken James to Cardinal Glennon Hospital to have his cast removed and that no therapy was ordered and everything was fine.

Michael West works for the Illinois Department of Children and Family Services. He investigates reports of child abuse and/or neglect. He was assigned to investigate a report of abuse against James Novy on April 3, 1989. The report indicated that the child had bruises on his buttocks. The reporter was Lonnie Smith, the principal of James' school. West went to the Novy home at approximately 4:15 that afternoon but got no response. He left his calling card in the door. The following morning, West telephoned Lonnie Smith in an at-

tempt to see the child at school but was advised that James was not at school at that time. At approximately 3 that afternoon, West went to the Novy home to attempt to see the child. No one was there so West again left his calling card. The next day, West received a telephone call from Keith Novy. An appointment was made for West to see the child at 6 p.m. the following day, April 6. West saw the child at the Novy home with Keith and defendant present. West examined James' buttocks and body and saw no bruises or physical injuries. Defendant told West that she had seen a bruise on James' buttocks but did not know how he got it. West then contacted the child's physician and paternal grandmother. He completed his investigation on July 3.

On May 23, 1989, West received another report of child abuse involving James Novy. West remembered nothing about the investigation.

On cross-examination, West testified that, after talking with James' physician and paternal grandmother, he had no concerns about the child.

Carol Teague-Douglas is also an investigator with the Illinois Department of Children and Family Services. On July 4, 1989, she received a report that James Novy was being left unsupervised. On July 5 and 7, Teague-Douglas went to the Novy home but found no one there. She left her card in the door. On July 14, Teague-Douglas spoke with defendant at Cardinal Glennon Children's Hospital. Teague-Douglas had received another report concerning James' broken leg. She saw James that day and observed that he had a broken leg and two bruises on his forehead. Defendant told Teague-Douglas that she had come into James' bedroom and seen him with his leg caught between the top bunkbed mattress and footboard. She heard his leg crunch before she could get to him. While at the hospital, Teague-Douglas also observed Johnny Novy and noticed that he had a bruise on his cheek and the beginning of a black eye.

On August 27, Teague-Douglas received a report of medical neglect concerning James Novy. The complaint alleged that James had had a wet cast, that his parents would not consent to a neurological examination and that he had been taken out of the hospital against medical advice. On August 29, Teague-Douglas spoke with defendant. Defendant stated that she had been suffering from a back problem which prevented her from lifting James and that is why he had been placed in the rehabilitation center. Her back problem had subsided, and she and Keith were able to care for James. She was now able to

change James' position and change his diapers so that his cast would not get wet.

The next report of abuse concerning James Novy came in on November 28, 1989. The report was that James had bruises to his face and neck. Teague-Douglas went to the Novy home on November 29 and spoke with defendant. Defendant stated that the children were at her aunt's home in Missouri, where they had gone because defendant had been feeling ill. Defendant stated that she would have to talk with Keith before she gave her the aunt's address. Teague-Douglas told defendant that she had to see the children right away and would Keith please call her right away.

The next morning, Teague-Douglas received a message from defendant that the children were at home and she could go by the house to see them. That morning, November 30, Teague-Douglas went to the Novy home. Defendant, Keith Novy and both children were present. Teague-Douglas observed dark bruises between James' nose and eyes on both sides of his nose. The bruises were very dark and had red tinges on the ends of them. James was seated on the floor playing with blocks. Teague-Douglas did not see any other bruises on him. James looked at Teague-Douglas when she entered the room. When Teague-Douglas asked James to come to her, he began crying very loudly as though he was afraid. Teague-Douglas noticed that James was thin, but he had been thin as long as she had known him. Defendant called James to her, and he went to her, sat on her lap and stopped crying. Regarding James' black eyes, defendant stated that James had been rubbing his eyes. She stated that they thought that because of his experience with hospitalization and problems in school he had become really emotionally disturbed. He sucked both thumbs and rubbed his eyes at the same time. This is what caused the black eyes. Teague-Douglas felt that the black eyes could not have been caused by being hit in the face. James' hair was quite long and covered his forehead and neck. He was wearing a T-shirt and jeans. Teague-Douglas did not examine James' body but noticed a bruise underneath James' chin.

On cross-examination, Teague-Douglas testified that James cried loudly when she called him to her. When he went to Keith, he whimpered very softly, and Keith picked him up. When he went to defendant, he stopped crying. James did not appear listless, could hold his head up and had no trouble walking.

Betty Overbey is the mother of Keith Novy and grandmother to James Novy. In June 1987, Overbey was made legal guardian of James and Johnny Novy. Keith Novy was in the Navy. In October

1987, Keith was discharged from the Navy. Overbey continued custody of the children until June 1988, when she released them to Keith. She continued to see the children frequently until February 1989. Beginning in February 1989, she had very little contact with the children. Between June 1988, when Keith resumed custody of the children, and February 1989, Overbey did not notice any bruising or injuries to the children. James did always have slight bruising to his backbone because he was so thin. James was always thin and pale. James always suffered from tremors, as did Johnny.

John Bouhasin is clinical professor of pediatrics at Cardinal Glennon Hospital for Children. He is also director of the division of hemostasis and thrombosis and director of the hemophilia clinic. Within his field of expertise is determining the age and cause of certain types of bruising and other types of injuries in children. He was qualified as an expert in the area of hemostasis.

In October 1990, he became involved in the case of James Novy. He was given a brief medical history and shown photographs and an autopsy report regarding James. He identified various photographs of the body of James Novy. He described the body as having multiple lesions, one on his forehead, around his eyes, some bruising of the left elbow, apparently some of the shoulder. There are very old bruises on the inside of the right knee and down along his right shin. There is a scab or an old bruise at the inside of the right heel and some at the left heel. The bruise on the left shoulder is fairly old, approximately two weeks of age. Along the spine are various bruises of varying age. One such area in the right upper shoulder in the back looks like a relatively fresh bruise. There is an old penetrating lesion on the left hip in the back. There is some bruising right above both buttocks. Behind the left ear is a large bruise.

Dr. Bouhasin explained how bruises were formed and how he was able to determine their ages. He then described the various injuries to James' body in greater detail. On the forehead was a penetrating lesion, a cut, which was three to four days old, most probably caused by a significant blunt trauma. Around both eyes, involving the inner side of the nose, both right and left, underneath the eyes, above the eyelids and between the eyebrows were bruises at least two weeks old. The left ear had two bruises, one on the helix of the ear, five to seven days old, caused by striking or pinching the ear, and one on the inside of the ear, two weeks of age. There were also bruises behind both ears, which is a classical "battle sign." It indicates that an individual has struck the child on both sides of the head at the same time with clinched fists together. This is a classical sign of child abuse. At the

base of the jaw on the right side, just below the right lower lip and the right point of the jaw, extending to the neck, were bruises at least three weeks of age.

Dr. Bouhasin testified that the bruising around the eyes could only be caused by considerable blunt force. At the point of the chin was a lesion or cut caused by a significant blunt trauma, five to seven days old. A bruise to the left upper shoulder was one week old. A lower bruise to the shoulder was two to three weeks of age. These bruises were caused by separate blunt traumas at different times. The lower part of the inside of the right knee had some very small bruises on it. There was bruising along the anterior shin of the right lower leg. These bruises were 7 to 10 days old. The left shin had a very old lesion, two to three weeks of age. Again, these injuries were caused by trauma, probably by walking and bumping into things. However, the bruises to the knee were caused by direct trauma to the knee, a striking with a blunt surface. A bruise at the crest of the hip bone in the back was an old penetrating wound which was a significant injury caused by trauma or an infection or a cigarette burn. A lesion more towards the midline right over the spine was relatively fresh, two to three days old. Above it and to the left was a lesion two to three weeks of age. A bruise going toward the buttocks on the left was old. These were all caused by different instances of trauma or injury to the back ranging in age from three to four days to one month or two months.

On the front of the chest were very, very old bruises. The left hand was bruised, and the left elbow was significantly bruised. The left front forehead was bruised. These bruises were fairly old. The left side of the chin had an old bruise. Both knees were bruised. These bruises were of various ages, from 10 days to three weeks. The bruises on the chest were caused by discrete blows with a blunt object; a fist, belt buckle, or stick, for example, probably a smaller object than a fist, such as a belt buckle or stick.

Describing the head, Dr. Bouhasin pointed out a subgaleal hemorrhage between the covering of the skull bone and the scalp. This can only be produced by grabbing the hair and lifting in a forceful and sudden motion. There were two or three of these types of injuries to James. There was also a subdural hemorrhage, which can only be caused by considerable force. The brain itself was swollen. These injuries were from one to three days old but were separate injuries. The brain itself also had bruising in at least five areas, of different ages. They indicate perhaps three separate episodes in a week span where the individual was injured and other episodes at least two weeks of

age. There were also other injuries to James described by the doctor, of various ages. Dr. Bouhasin also described internal injuries which were included in the autopsy report of Dr. Parks. These injuries were consistent with multiple blunt traumas to the abdomen. They had to have been caused by at least two, to as many as five, thrusts with a blunt instrument into the abdomen with considerable force, all at different times ranging in age from one day to three to four weeks.

In conclusion, Dr. Bouhasin testified that the child suffered from a significant number of episodes of trauma causing both external and internal injuries. The injuries range in age from one to two days to two to three months. Conservatively, injuries to the abdomen indicate three episodes of significant-force trauma, the brain at least five such episodes, and the skin and shoulders and back and legs would indicate at least another 10 to 12 such episodes. Finally, the doctor testified that the child had been taking no medication and suffered from no condition which would have affected his potential for bruising. None of the injuries could have been caused by a fall from a standing position of the child onto a floor that was covered by carpeting.

Dr. Armond Edward Brodeur is a medical doctor who specializes in pediatric radiology. He is an expert in the determination of child abuse and in pediatric radiology. He testified that the single most-common denominator of child abuse is multiple injuries. Also indicative of child abuse is family patterns where family members are not getting along. The way a parent carries his or her child can also indicate whether the relationship is a loving one. Another indication of child abuse is bruises in inaccessible places, such as behind the ears, under the chin, in the small of the back, or behind the knees, places where children are not likely to injure themselves.

Dr. Brodeur was involved in the analysis of information regarding James Novy. He examined radiographs, or X rays, of James' thigh injury. The X ray shows a spiral fracture of James' left thigh bone, with a little bit of displacement of the lower fragment. A spiral fracture is a twisting type of fracture where the fracture spirals around the bone. The fracture had healed normally. Brodeur testified that, at any age, the thigh bone is the longest and strongest bone in the body. It is therefore the most difficult to break, requiring an enormous amount of force to do so. Thigh bone fractures in children are rarely seen except in automobile accidents, falls out of tall trees or similar accidents. Brodeur did not think a fractured femur could be caused by falling out of a bunkbed while the foot was lodged between the mattress and footboard, as described by defendant. Brodeur opined that for the amount of force required to fracture the femur, the mattress

would have given. Furthermore, the fracture is spiral, rather than transverse. A fall as described by defendant might have fractured the femur transversely, or cracked the ankle or torn knee ligaments, but would not have resulted in a spiral fracture of the femur.

Dr. Brodeur also examined X rays of James' skull, taken July 14, 1989. The skull bone appears normal in development and maturation. There were no fractures evident. Brodeur also reviewed X rays of James' skull taken December 1, 1989, the date of James' death. The skull is fractured about half way up the back of the skull near the area of the brain which controls balance and motion. The skull has another fracture on the left side near the level of the top of the ear. The two fractures are separate and did not happen at the same time. This second fracture is near the portion of the brain known as the motor strip in a right-handed person, which controls the individual's ability to do motor functions. While it is very difficult to determine the age of a skull fracture from X rays, Brodeur opined that James' fractures were older than 24 hours, maybe 48 hours to even as old as a week. However, the fractures were well under three months of age.

Brodeur testified that the skull bones of a four-year-old are strong. It would take a very hard blow to crack the skull bone. It does not happen easily. It would probably take more than a blow with the open hand and probably more than a blow with a fist. It does not happen by bumping into a wall, nor would it happen by a fall from a standing position onto a carpeted floor.

Brodeur testified that he also looked at photographs of the child's body. The injuries depicted in those photographs were consistent with a child suffering from child abuse. The child sustained multiple severe injuries at different periods of time, sustained a fractured femur which had no logical explanation, sustained sufficient injuries to the left side of the skull to have induced a large amount of cerebral hemorrhage, and had bruises in inaccessible places. Brodeur saw evidence of systematic destruction of a four-year-old child over a period of time.

At this time, the prosecutor read to the jury the statements given by defendant to the police on December 1, 1989, December 2, 1989, and December 3, 1989. The statement of December 1 recites that defendant is 21 years of age. Defendant began dating Keith Novy on February 13, 1989. On March 18, 1989, she moved into Keith's house. On December 1, 1989, at approximately 9 a.m., defendant awakened James and fed him a bowl of Rice Krispies at 9:30. James played with his brother until approximately 10:30, when defendant gave him a bath. The children continued to play during and after their bath. At

12:15, Keith came home but then left. James ate a taco for lunch and took his heart medicine. He then took a nap from 1 p.m. to 3:15. At 3:30, James ate jello. At 3:30 or 3:45, James started to urinate in his pants at the same time he was telling defendant that he had to go to the bathroom. Defendant helped him down from the table and admonished him. He began whimpering but not crying. He started walking to the bathroom but collapsed. He fell backwards, hitting the middle of the back of his head on the floor. Defendant ran to him and gave him CPR. She could see his chest rise and fall. She called an ambulance and Keith and resumed CPR until the ambulance came. James was taken to Scott Air Force Base hospital. Keith and defendant went to the hospital.

Before James fell he had lightly bruised eyes at the nose area. This was from him sucking his thumb and rubbing that area, which he had done for four nights. He had no bruises behind his ears when defendant gave him a bath that day. He had a scab below his chin which he continually picked at and scars on his butt from his cast rubbing on his diaper rash.

Defendant and Keith do not use any physical discipline on the children. James had not fallen recently.

Defendant's statement of December 2 recited that some of the things she had said in her statement of December 1 were not true. She had lied because she did not want to be charged with the death of James. However, everything in the statement of December 2 is the truth.

Defendant described the forms of discipline which she and Keith had used on James. They would verbally warn the children. If this did not work, they would stand them in the corner. They also had a "time out rocking chair." For a period of time, they never physically struck the children.

About two months ago, defendant and Keith began spanking the children on the butt with an open hand. Occasionally, they would hit James in the head with an open hand and strike him on the butt with a belt. She described the belts used. Other methods of discipline were having James carry a suitcase from the basement door to the front door, telling the child that if he did not behave he would have to leave. They also had James walk carrying a book in his arms out in front of him in order to strengthen his arms. Sometimes they would make James get in the bathtub and would use the showerhead to spray water on him. Keith would use cold water and defendant would use warm water.

On November 6, 1989, James' teacher called and said that James was sick. Defendant went and picked him up. He seemed fine, but at the parent/teacher conference that evening he again became sick. After that, James would throw up every time they mentioned school.

Keith and defendant had reached their wits' end with James and talked about allowing Keith's mother to care for James for a while. They decided not to do this.

On November 16 or 17, Keith made the two children stand back to back and hit their heads together hard enough that defendant heard it while standing in the kitchen. She thought, and told Keith, that he should not have done that. This was the hardest James' head had been struck as far as she knew. On November 19, James' eyes began to turn purple and later black. Also on November 19, James began to not sleep for four nights. Although they were worried about James, they did not take him to the doctor because DCFS would have been notified. They did not want to go through another investigation. They thought the black eyes were from him sucking his thumb and rubbing his eyes. At the same time, they noticed James began to wet his pants more during the daytime.

Several days later, defendant returned home from her sister's at approximately 6 or 7 p.m. The chair that James usually sat in was knocked over and the back of it was knocked off. The bat that is usually in the bedroom was lying on the floor in front of the sink. Keith told defendant that he had hit a roll with the bat in order to show James what the bat could do. There was a cracked roll in the waste can. The magnets on the refrigerator door had slid down to the bottom. Keith told defendant that he had yelled at James and lost his head because James was getting on his nerves and he was out of cigarettes. He had wanted to scare James. James had begun to sleep more.

On November 27, James' teacher called to inquire why James was not in school. Defendant lied and stated that James was in Missouri at her aunt's home. James was not going to school because of the fear that the school would call DCFS because of James' black eyes. Defendant told Mike Inyart and Carol Douglas of DCFS the same story on November 28 and 29.

On November 30, Carol Douglas had an appointment to come to the Novy home to see James. Prior to her arrival, Keith was quizzing James about Keith and defendant hitting him. Keith would ask James whether mommy and daddy hit him and James would say no. Keith would say that was right, mommy and daddy did not hit him.

What defendant had stated in her statement of December 1 regarding James' death was true except that she may have grabbed him by the shoulders in helping him down from the table harder than she had intended. She is certain that she did not strike James that day and that no one else could have struck him that day. No one else had had the opportunity to strike James since two weeks prior to Thanksgiving.

Defendant felt that the times she had hit James in the head could not have caused any damage, so it had to have been Keith who hurt James. Keith is capable and has the ability to cause the type of damage James suffered, but it had to be unintentional if he did it.

Defendant's statement of December 3 was read. It merely indicated times when Keith was alone with the children. Also, after Thanksgiving, there was one period of time when it appeared that all of James' muscles just relaxed. The State rested.

The defendant called six character witnesses, who testified that defendant has a reputation in the community for being nonviolent and peaceful.

Truman Slinkard is defendant's father. Defendant has a reputation in the community for being very peaceful. Between February 1989 and fall of 1990, Slinkard noticed that defendant had an injured thumb. It had a brace on it. She also had an injury to her ankle, which had a cast on it. He also noticed what looked like burn marks across her forehead. They were just little spots. On cross-examination, Slinkard clarified that the injuries to defendant's thumb and ankle occurred in 1990. The burn marks occurred in 1989.

The defendant's main witness was Dr. Daniel Cuneo, a clinical psychologist, who was qualified as an expert in that field. Cuneo evaluated defendant during November and December 1990 and January 1991. He interviewed her and gave her a psychological test. He interviewed her mother and reviewed her medical files dating from May 11, 1989, to September 1990. Based upon his evaluation of defendant, he came up with a primary diagnosis of dependent personality disorder. She also has a major depressive episode. A dependent personality disorder causes difficulty in an individual's daily functions. It is a pervasive pattern of dependent submissive behavior.

Defendant gave Dr. Cuneo a history as follows. Defendant had a happy childhood. The main discipline used was grounding. Her mother was fairly strict but her father was very easy going. Defendant was a good student. She did not date until she reached the age of 20 years. Defendant's mother never liked any of the men she dated. Defendant was 21 years of age when she met Keith Novy. Keith was 26. She

moved in with Keith one month after starting to date him. Defendant's parents did not like Keith, and defendant, who had been living with her parents, felt that she either had to stop seeing Keith or move in with him.

After defendant had dated Keith one week, he entered the psychiatric unit of a hospital, diagnosed with manic depressive disorder. He remained in the hospital for three weeks. When he was released, defendant moved in with him. By doing so, defendant cut herself off from her family.

In June, defendant quit her job. Defendant was sick, her co-workers did not like Keith, and Keith wanted her to quit her job, so she did. This left defendant cut off not only from her family, but also from her job. After this, Keith became very possessive. He would get mad whenever defendant spoke with her parents. He disapproved of any outside contact she had with anyone. During some fights, Keith would hit defendant. Keith also verbally abused defendant. Defendant got into a pattern of always giving in to Keith. Because of health problems, defendant suffered pain during sexual intercourse. However, she continued to have intercourse with Keith because he would pressure her and she would give in. This demonstrates a pattern of a very passive individual, an individual who feels trapped with nowhere to go.

Defendant has suffered from bruised thumbs, twisted ankles and stomach problems. She visited the emergency room often while living with Keith.

Based upon this history, Cuneo diagnosed defendant as having a dependent personality disorder. Defendant has a very compliant, flat personality. Defendant also suffers from learned helplessness. This condition causes her to feel helpless and take no action to help herself. She passively acquiesces to demands. It is typical in a battered individual and causes him or her to stay in the abusive relationship. People suffering from learned helplessness feel there is nothing they can do to change their situation. They often appear zombie-like.

Defendant's ability to stop Keith Novy from abusing the children would have been impaired by her personality disorder. Defendant was being abused herself but still stayed in the relationship because she was afraid to get out of it. She would also have been less able to help others.

On cross-examination, Cuneo testified that the beatings defendant received from Keith Novy increased in frequency and severity after James died. In 1989, defendant only made one trip to the emergency room. In June 1989, she reported to the emergency room stating that

she had hit her thumb on a door. There were no reports of abuse made by defendant and no evidence of any bruising or broken bones.

On redirect examination, Cuneo testified that the beatings escalated after James died. There was one report in June 1989. Reports increased after James died. On December 28, 1989, defendant was admitted to the hospital for depression. March 1, 1990, defendant went to the hospital complaining of her stomach hurting. She told Cuneo that this might have been caused by having been hit in the stomach so often by Keith. She never reported to hospital personnel that she had been beaten. She returned to the hospital with stomach pains on April 9, 1990, again possibly from having been hit in the stomach. Again on April 12, 1990, she complained of stomach pains. On May 1, 1990, defendant reported with a twisted ankle. She told the emergency room personnel that she had injured it playing tennis. She told Cuneo that four days after that, Keith took the ankle and twisted it to hurt her while they were fighting. On June 10, 1990, she reported burns to her hands which were not caused by any abuse by Keith but were accidental. The defendant rested.

In rebuttal, the State called Vicki Slinkard and Robin Brown, the defendant's sisters. Vicki testified that between February 1989 and December 1989, she spoke with defendant every two weeks or once a week at the most. She saw defendant once a week. Vicki never noticed any bruises on defendant. Robin testified that she spoke with defendant one to three times a week.

In closing argument, the State argued that the abuse to James began in March 1989, when defendant moved in with Keith Novy and his children. Prior to that time, there had been no complaints of abuse against Keith Novy. Defendant moved in with Keith on March 18, 1989; the first complaint of abuse was made to DCFS on April 3, 1989. After this, and up until James' death, the abuse got progressively worse, until it ended in death. Defendant admitted that she was alone with the child when his femur was inexplicably broken. The State also argued that defendant is accountable for the actions of Keith Novy in beating and abusing James. She repeatedly and continually made excuses for James' injuries and his absences from school, enabling Keith to continue beating and hurting James. Further, she made no effort to seek any kind of help for James.

The defendant argued in closing that evidence of abuse and neglect of James appeared prior to March 1989, when defendant moved into the Novy home. Between October 1988 and March 1989, James had excessive absenteeism from school. His doctors testified that he appeared to suffer from failure to thrive, tremors and developmental

delays before defendant moved into the home. Further, defendant cannot be held accountable for the actions of Keith Novy because, according to Dr. Cuneo's testimony, she suffered from a disability which prevented her from doing anything to help James.

On appeal, defendant argues that the State failed to prove her guilty of first-degree murder beyond a reasonable doubt because the State failed to prove, through direct or circumstantial evidence, that she committed any act that caused the death of the child. The State failed to prove that defendant struck James with sufficient force to cause injuries sufficient to cause death. According to the expert medical testimony, such a blow would have had to have been quite forceful. In her statement to police, defendant stated that, although she occasionally struck James on the head, she did not do so with enough force to cause the injuries which led to his death. Only Keith Novy could have committed this offense.

Furthermore, defendant argues that the evidence was not sufficient to prove her accountable for the actions of Keith Novy. There is no evidence that defendant aided or helped Keith in any of the beatings of James. Most of James' injuries were internal and not visible to defendant, and therefore she could not have been aware of the severity of the injuries. Because of her personality disorder, defendant was unable to stop Keith Novy from injuring James.

Defendant argues that her actions were reckless, not intentional, because she intended neither to kill James nor cause him great bodily harm. Her failure to act to protect James and her making excuses for his injuries and absences can be characterized as reckless, not intentional, acts.

Upon review of the sufficiency of the evidence to support a conviction, all of the evidence is to be considered in the light most favorable to the prosecution. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) The inquiry upon review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) The presumption is that the trier of fact resolved all controverted facts and questions of testimonial credibility in favor of the State (*People v. White* (1991), 209 Ill. App. 3d 844, 868, 567 N.E.2d 1368, 1382), and it is not the function of the reviewing court to retry the defendant. (*Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) A conviction will not be set aside unless the evidence is so unsatisfactory as to create a reasonable doubt of the defendant's guilt. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402, 410.) We think in the

instant case that the evidence is sufficient to support defendant's conviction on both the theories that she committed the acts which led to James' death, and that she is accountable for the actions of Keith Novy in committing the acts which led to James' death.

■ There can be no reasonable doubt that James Novy died as a result of repeated and severe beatings and abuse at the hands of either his father or the defendant. The defendant admitted in her statement to the police of December 2, 1989, that about two months before James' death, she began hitting James on the head with an open hand and hitting him on the buttocks with a belt. She described other forms of physical and mental abuse she inflicted upon the child. Defendant knew that James was injured and not doing well but declined to do anything about his injuries and in fact covered up his injuries because she feared an investigation by DCFS. Furthermore, defendant admitted that she had lied to the police in her statement of December 1, 1989, because she feared she would be charged in the murder of James. Defendant also admitted that no one other than herself and Keith had the opportunity to injure James. Furthermore, it appears from the record that defendant was most often left alone with James and was alone with James when his left femur was fractured. She apparently had the greatest opportunity to inflict the fatal injuries on James. We think a reasonable jury could have found that, despite defendant's denial that she inflicted the fatal injuries, she did strike James with sufficient force to cause the injuries which led to James' death.

A reasonable jury could also have found that, even if defendant did not administer the fatal blows, she was accountable for the actions of Keith Novy in inflicting the fatal injuries. In order to establish guilt based upon a theory of legal accountability, the State must prove beyond a reasonable doubt that either before or during the commission of the offense, the defendant solicited, aided, abetted, agreed or attempted to aid another person in the commission of the offense and that such participation was with the concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Watts* (1988), 170 Ill. App. 3d 815, 824-25, 525 N.E.2d 233, 240.) It need not be shown that the defendant had a specific intent to kill or participated in a preconceived plan to commit murder. Where there is a common design to participate in an illegal act, such as aggravated battery to a child, and death occurs during the prosecution of the common objective, all participants are guilty of murder. Such a common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct such as: presence at the scene of

the crime without disapproval or opposition; a continued close association with the perpetrator after the criminal act; a failure to report the incident to the authorities; and/or the subsequent concealing or destroying of evidence of the crime. The existence of a common design is a question of fact for the jury. (*Watts*, 170 Ill. App. 3d at 825, 525 N.E.2d at 240.) The defendant's acts need only have contributed to the death, and the defendant may be accountable even though he had no intent to and did not personally kill the victim. *People v. Kelly* (1985), 136 Ill. App. 3d 154, 162, 482 N.E.2d 614, 619.

▮▮ In the instant case, even if it is assumed that defendant did not inflict the fatal blows on James, she admitted that she did hit James in the head, beat him with a belt and inflicted other forms of abuse on him. Furthermore, she was aware of the severity of the beatings inflicted on James by Keith Novy. She told the police on December 2, 1989, that just two weeks before James' death, Keith struck the two children's heads together so hard that defendant heard it in the kitchen. It was after this that James began to show signs of severe head injury. Defendant was also aware that Keith had at least threatened James with a baseball bat, and it is not an unreasonable inference from all the evidence that Keith hit James in the head with the bat and defendant knew this. Defendant was well aware of the severity of James' injuries. Despite this, defendant continued to associate with Keith Novy, she did not inform the authorities of the batteries upon James, despite numerous opportunities to do so, and she even concealed the evidence of the offense by making excuses for James' injuries and absences. We think that the evidence is sufficient to support a finding of a common design to batter the victim and that a conviction based upon a theory of accountability is supported by the evidence. As in *People v. Ray* (1979), 80 Ill. App. 3d 151, 156-57, 399 N.E.2d 977, 981-82, defendant's continued presence while the victim was being beaten and her subsequent attempted cover-up are sufficient to show a common design to do an unlawful act.

Finally, defendant argues that her conduct was merely reckless and not intentional because she did not intend to kill or cause great bodily harm to the victim. Her personality disorder, as testified to by Dr. Cuneo, impaired her ability to perceive the nature of the abuse to such an extent that she should only be held to have committed involuntary manslaughter. She did not accurately perceive the need to protect James, and her failure to report the abuse and her making excuses for James' injuries and absences should be characterized as reckless actions, not intentional acts.

The jury was instructed on the offenses of murder and involuntary manslaughter and found defendant guilty of the offense of murder. This finding is justified by the record.

One commits murder when, in performing the acts which cause the unjustified death, he knows that such acts create a strong probability of death or great bodily harm to the victim. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1).) One commits involuntary manslaughter when he kills an individual and the acts which cause the unjustified death are such as are likely to cause death or great bodily harm and he performs them recklessly. (Ill. Rev. Stat. 1989, ch. 38, par. 9—3(a).) A person acts recklessly when he consciously disregards a substantial and unjustifiable risk of death or great bodily harm. *People v. Bolden* (1978), 59 Ill. App. 3d 441, 448, 375 N.E.2d 898, 903.

We think the evidence in the instant case is sufficient to establish beyond a reasonable doubt that defendant knew that the abuse inflicted upon James created a strong probability of death or great bodily harm. Defendant was well aware of the severity of James' injuries, and the great bodily harm to which he had been subjected was plainly apparent to his teachers, a grocery store manager and other strangers who came into contact with him. Furthermore, defendant admitted to the police that she did not report James' injuries or take any actions to protect James because she was afraid of a DCFS investigation. She further admitted that she lied to the police in her initial statement to them because she was afraid of being charged in James' death. A reasonable jury could conclude that defendant acted intentionally and knowingly, rather than recklessly, and find beyond a reasonable doubt that she is guilty of murder rather than involuntary manslaughter.

If the trier of fact was justified on the record in concluding that defendant was guilty of the offense of murder beyond a reasonable doubt, a reviewing court will not exercise the power granted it by Supreme Court Rule 615(b)(3) (134 Ill. 2d R. 615(b)(3)) to reduce the degree of the offense for which defendant was convicted. (*People v. Carpi* (1976), 44 Ill. App. 3d 364, 371, 358 N.E.2d 355, 361; *People v. Meadows* (1981), 92 Ill. App. 3d 1028, 1032-33, 416 N.E.2d 404, 406.) Defendant was proved guilty of the offense of first-degree murder beyond a reasonable doubt, and we will not reduce her conviction to one for involuntary manslaughter.

Defendant's second argument on appeal is that she was denied a fair trial because the trial court allowed into evidence and allowed the jury to view gruesome autopsy photographs of the deceased. We agree with defendant that the photographs in question are extremely grue-

some. However, even gruesome photographs are properly admitted and shown to the jury where they are relevant to some issue in the case and their nature is not so prejudicial as to outweigh their probativeness. (*People v. Henderson* (1990), 142 Ill. 2d 258, 319, 568 N.E.2d 1234, 1263.) The responsibility of weighing the probative value and potentially prejudicial effect of the photographs rests with the trial judge, and his decision as to which evidentiary items should be viewed by the jury will not be disturbed absent a clear showing of abuse of discretion. (*People v. Lucas* (1989), 132 Ill. 2d 399, 439, 548 N.E.2d 1003, 1019.) Among the valid reasons for admitting photographs of a decedent is to prove the nature and extent of injuries and the force needed to inflict them; to prove the position, condition and location of the body; to prove the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness. *Henderson*, 142 Ill. 2d at 319-20, 568 N.E.2d at 1264.

The photographs in the instant case are 8- by 10-inch glossy pictures taken of the decedent during the autopsy. All show large quantities of fresh blood, open body cavities, internal organs and large incisions due to the autopsy procedure. Many also display tools used in the autopsy procedure.

Defendant argues that the use of the photographs was merely cumulative of other, less prejudicial, evidence, such as the testimony of Dr. Harry Parks, who performed the autopsy, and Dr. Bouhasin, who testified as an expert witness as to the nature and cause of decedent's injuries. Their testimony was clear and understandable without the use of the photographs, and the use of the photographs was unnecessary to an understanding of their testimony. The photographs served no purpose other than to inflame the jury and deprive defendant of a fair trial.

Defendant argues that the prejudicial effect of the photographs far outweighs their probative value. Defendant did not contest the injuries to the decedent but merely contended that she did not inflict them and was not accountable for them. The internal injuries shown in the photographs were not visible to defendant and consequently do not demonstrate that she was aware of those injuries.

■ We think the photographs, although gruesome, were admissible as an aid to understanding the expert testimony of Dr. Parks and Dr. Bouhasin. Even though photographs may be somewhat cumulative of the testimony of a witness, they may also aid jurors in understanding this testimony. (*Henderson*, 142 Ill. 2d at 320, 568 N.E.2d at 1264.) Both doctors used the photographs to explain, demonstrate and

clarify their testimony. Expert medical testimony is often difficult for the layperson to understand, and the use of photographs may make that testimony more real and understandable.

The photographs were also relevant to prove that James' death was not due to accidental causes but to repeated and prolonged abuse at the hands of either defendant, Keith Novy or both. The photographs were relevant to prove the nature and extent of James' injuries, the force needed to inflict them and the manner and cause of his death. Even where a defendant concedes some facts or offers to stipulate to them, the State is still allowed to prove every relevant fact. *Henderson*, 142 Ill. 2d at 319, 568 N.E.2d at 1263.

The trial court found, over defendant's objection, that the photographs were not cumulative and were relevant. The trial court did not abuse its discretion in so finding. While the photographs are gruesome, they are also probative. We think their prejudicial effect is outweighed by their probative value, and the trial court did not abuse its discretion in so finding. The photographs were properly admitted into evidence and shown to the jury, and the defendant was not deprived of a fair trial as a result.

■ Defendant's final argument on appeal is that this court must vacate the judgments entered by the trial court on the offenses of aggravated battery to a child and cruelty to a child which, she argues, are lesser-included offenses of the offense of first-degree murder. The State agrees that the judgments must be vacated not because they are lesser-included offenses of first-degree murder but because they are based on the same physical act as is defendant's conviction for first-degree murder.

All three counts of the indictment against defendant allege that she is guilty of the various offenses because she struck James Novy about the head and and body. Accordingly, because it is well settled in Illinois that multiple convictions must be vacated when they are based upon the same physical act (*People v. Brackett* (1986), 144 Ill. App. 3d 442, 449, 494 N.E.2d 610, 615, *aff'd* (1987), 117 Ill. 2d 170, 510 N.E.2d 877), we vacate the judgments entered upon defendant's convictions for aggravated battery to a child and cruelty to a child.

Because we find that defendant was not deprived of a fair trial by the admission into evidence and viewing by the jury of autopsic photographs, and because we find that defendant was proved guilty beyond a reasonable doubt of the offense of first-degree murder, we affirm defendant's conviction and sentence therefor. Because defendant's convictions for aggravated battery to a child and cruelty to a child are based on the same physical act as her conviction for first-degree mur-

der, we vacate the judgments of guilty entered upon defendant's convictions for aggravated battery to a child and cruelty to a child.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed in part and vacated in part.

Affirmed in part, vacated in part.

GOLDENHERSH, P.J., and CHAPMAN, J., concur.