**Richard L. RILEY, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7834.**

Court of Appeals of Alaska.

Dec. 27, 2002.

---

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

James L. Hanley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Richard L. Riley and another man, Edward F. Portalla, opened fire on an unsuspecting crowd of young people who were socializing around a bonfire on the Tanana River near Fairbanks. Two of the young people were seriously wounded. Riley and Portalla were indicted on two counts of first-degree assault (recklessly causing serious

physical injury by means of a dangerous instrument) and six counts of third-degree assault (recklessly placing another person in fear of imminent serious physical injury by means of a dangerous instrument).[1] Riley was ultimately convicted of all eight charges. In this appeal, Riley challenges his two convictions for first-degree assault.

The State faced a problem in prosecuting Riley and Portalla for first-degree assault: the physical evidence (in particular, the ballistics analysis) did not reveal which of the defendants' weapons had fired the wounding shots. The bullet recovered from the body of one victim was so deformed that it could not be matched to either Riley's or Portalla's weapon, and the bullet that wounded the other victim passed through the victim's body and was never recovered. Thus, with respect to each victim, the State could prove that the wound was inflicted by one of the two defendants, but the State could not easily prove which one.

At the close of Riley's trial, the jurors were instructed that, with regard to each count of first-degree assault, they should decide whether Riley acted as a "principal" (i.e., by firing the wounding shot) or, if they could not decide beyond a reasonable doubt which man fired the shots, they should decide whether Riley acted as an "accomplice" (i.e., by aiding or abetting Portalla to fire the wounding shot). The jurors found Riley guilty as an accomplice in the wounding of both victims.[2]

Riley argues that his convictions for first-degree assault are flawed because the jurors were misinstructed regarding the elements of accomplice liability. The alleged flaw concerns the culpable mental state that must be proved when the State alleges a defendant's complicity in another person's crime.

In *Echols v. State*, 818 P.2d 691 (Alaska App.1991), this Court addressed a situation where a wife was charged as an accomplice to first-degree assault committed by her husband. The State's evidence showed that the defendant summoned her husband to discipline their child, then stood by and watched while the husband inflicted serious physical injury on the child by whipping her with an electric cord.[3] The question was whether the wife's conduct was sufficient to establish her accountability as an accomplice to the assault.

The underlying crime of first-degree assault required proof that the principal (i.e., the husband) acted recklessly with respect to the result (i.e., the infliction of serious physical injury). The State argued that the wife could be convicted as an accomplice to the first-degree assault because (1) she solicited her husband to discipline the child and (2) she acted with the culpable mental state required for the crime—i.e., she acted recklessly with respect to the possibility that the beating would result in serious physical injury to the child.

But this Court held that the wife's complicity could not be premised on recklessness. Rather, we held that the wife could be held accountable as an accomplice to the first-degree assault only if the State proved that she acted *intentionally* with respect to the prohibited result—i.e., that her conscious objective was to have the child suffer serious physical injury.[4]

In the present appeal, Riley relies on *Echols*. He contends that his jury instruction on accomplice liability was flawed be-

---

**1.** AS 11.41.200(a)(1) and AS 11.41.220(a)(1)(A), respectively.

**2.** Throughout this opinion, we will use the term "principal" to refer to a person who perpetrates a crime by their own conduct, while the term "accomplice" will refer to someone who, under our complicity statute (AS 11.16.110) is legally accountable for the conduct of another. Our use of these terms differs from the common-law terminology of "principal" and "accessory". At common law, both Riley and Portalla would be principals: whoever fired the wounding shot would be a "principal in the first degree", while

his cohort would be a "principal in the second degree"—a term that referred to any person who was present at the scene of a crime (either actually or constructively) and solicited, encouraged, or assisted the commission of the crime. See Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd ed.1982), pp. 738–744; Wayne R. La-Fave & Austin W. Scott, Jr., *Criminal Law* (1986), § 6.6(b), Vol. 2, pp. 128–29.

**3.** *Echols*, 818 P.2d at 692.

**4.** *Id.* at 695.

cause it failed to clearly inform the jurors that the State was obliged to prove that Riley intended to have Portalla inflict serious physical injury on the victims (and not simply that Riley acted recklessly with respect to the possibility that Portalla's conduct would cause this result).

The first hurdle Riley faces is that he did not object to the accomplice liability instruction that he now challenges. Riley must therefore show that the instruction amounted to plain error. We conclude that the jury instruction did not amount to plain error for two reasons: first, the instruction was not obviously flawed, but only potentially ambiguous on the question of the required culpable mental state; and second, the parties' summations to the jury cured the potential ambiguity in the instruction.

But, more important, the State asks us to re-examine our holding in *Echols*. We have done so and, for the reasons explained here, we conclude that we misstated the law of complicity in *Echols*.

We were wrong when we said in *Echols* that liability for assault or criminal homicide under a complicity theory always requires proof that the defendant intended to cause the injury or the death, even though the underlying crime requires proof of only a lesser culpable mental state (extreme indifference to the value of human life, recklessness, or criminal negligence). When a defendant solicits, encourages, or assists another to engage in conduct, and does so with the intent to promote or facilitate that conduct, the defendant becomes accountable under AS 11.16.110(2) for that conduct. If that conduct leads to unintended injury or death, the defendant can be convicted of assault or criminal homicide if the government additionally proves that the defendant acted with the culpable mental state required for the charged crime.

Thus, to establish Riley's guilt of first-degree assault in the present case, the State did not have to prove that Riley acted with the intention of causing serious physical injury. Rather, the State had to prove that Riley acted recklessly with respect to the possibility that serious physical injury would be inflicted on another person through (1) Riley's own conduct or (2) the conduct of another for which Riley was accountable under AS 11.16.110. And, to prove that Riley was accountable for Portalla's conduct under AS 11.16.110(2), the State had to prove (1) that Riley solicited, encouraged, or assisted Portalla's act of shooting at the victims, and (2) that Riley did so with the intent to promote or facilitate this conduct.

To summarize: when two or more people are jointly accountable for conduct under Alaska's complicity statute, and if, on the basis of that conduct, they are charged with a crime that is defined in terms of an unintended injury or death (*i.e.*, an injury or death for which the accompanying culpable mental state is something other than "intentionally"), that same culpable mental state—whether it be "extreme indifference to the value of human life", "recklessness", or "criminal negligence"—applies to the State's prosecution of all participants, whether they acted as principals or accomplices, and regardless of whether the resulting injury or death can be linked beyond a reasonable doubt to a particular defendant's conduct.

*The challenged jury instruction on complicity, and why we conclude that this instruction did not constitute plain error under the Echols rule*

AS 11.16.110 codifies the basic rules governing vicarious liability in Alaska—*i.e.*, it specifies the situations in which one person is criminally responsible for another person's conduct. Under AS 11.16.110(2)(B), a defendant is legally accountable for another person's conduct if the defendant "aids or abets the other in planning or committing the offense" and if the defendant does so "with [the] intent to promote or facilitate the commission of the offense". Riley was convicted of first-degree assault under the theory that, acting with the intent to promote or facilitate Portalla's commission of first-degree assault, he aided or abetted Portalla to engage in the conduct that resulted in the wounding of the victims.

In *Echols,* this Court was asked to construe the phrase "with intent to promote or facilitate the commission of the offense" as it applied to crimes that require proof of a

particular result (for instance, the infliction of serious physical injury). We held that a defendant does not intend "to promote or facilitate" the commission of such an offense unless the defendant intends that the prohibited result occur. *Echols*, 818 P.2d at 695. Thus, even though the principal might be convicted on proof that he or she acted "recklessly" or with "criminal negligence" with respect to the prohibited result, the accomplice could not be convicted unless the State proved that the accomplice acted "intentionally" with respect to that result.

At Riley's trial, his attorney proposed the following instruction concerning Riley's potential liability as an accomplice to first-degree assault:

A person is legally accountable for the conduct of another person which constitutes the offense if, with intent to promote or facilitate the commission of the offense, the person aids or abets the other person in planning or committing the offense.

In order to establish that the defendant is legally accountable as an accomplice in this case, the state must prove beyond a reasonable doubt each of the following:

. . .

[that] Richard L. Riley acted with intent to promote or facilitate the commission of ... Assault in the First Degree on [the victim]; [and]

[that Richard L. Riley] aided and abetted another person in planning or committing the offense.

Even though he was the proponent of this instruction in the trial court, Riley contends on appeal that the instruction was flawed because it did not specifically require the State to prove that Riley intended that the victim suffer serious injury. We agree with Riley that the instruction is ambiguous on this point. It could be read to require proof that Riley acted with intent to promote or facilitate the result required for first-degree assault (*i.e.*, serious physical injury). On the other hand, the instruction could also be read to require proof merely that Riley acted with

intent to promote or facilitate Portalla's dangerous conduct. Under *Echols*, this second reading of the instruction would be erroneous.

■ But we have repeatedly held that ambiguities and potential flaws in jury instructions can be cured by the arguments of the parties.[5] Here, the ambiguity in the instruction was clarified and corrected by Riley's attorney during his summation to the jury. Riley's attorney told the jury:

*Defense Attorney:* [The instruction] says [that the defendant has to] promote or facilitate the crime. Facilitate what? The offense. It's not just a crime or something that happens. It has to be the [defendant's] objective that's—people, the two people, receive serious physical injury by means of a dangerous instrument. Assault in the first degree.

The prosecutor did not object to the defense attorney's characterization of the elements of the State's proof, nor did the prosecutor refute or contradict the defense attorney's characterization during rebuttal. In fact, the prosecutor argued that the jury could infer, from Riley's actions, that Riley wanted Portalla to wound the victims.

Based on this record, we conclude that the parties' closing arguments cured the potential ambiguity in the complicity instruction. Thus, even under the *Echols* rule, the challenged jury instruction did not give rise to plain error.

Moreover, for the reasons discussed in the next section of our opinion, we conclude that the rule announced in *Echols* is wrong.

*Why we conclude that our decision in Echols misstated the law governing complicity*

*(a) The underlying problem*

Under the law of complicity codified in AS 11.16.110(2), even though a defendant may have solicited, encouraged, or assisted another person's criminal conduct, the defendant can not be held criminally responsible for the other person's conduct unless the State proves that the defendant acted "with intent

---

5. *See, e.g., Norris v. State,* 857 P.2d 349, 355 (Alaska App.1993); *O'Brannon v. State,* 812 P.2d 222, 229 (Alaska App.1991).

to promote or facilitate the commission of the offense". The question is: What did the legislature mean when they required proof that the accomplice acted with the intent to promote or facilitate "the offense"?

When the underlying offense requires proof of the defendant's intention to cause a particular result (for example, first-degree murder under AS 11.41.100(a)(1), a crime that requires proof of an intent to cause death), the phrase "intent to promote or facilitate the commission of the offense" seems to offer little trouble. Because the principal must intend to cause death, any accomplice to first-degree murder must likewise intend to cause death.

But what if the underlying offense is defined in terms of an *unintended* result? For example, a person commits second-degree murder under AS 11.41.110(a)(2) by unintentionally causing a death while engaged in conduct "manifesting an extreme indifference to the value of human life". Similarly, a person commits manslaughter under AS 11.41.120(a)(1) by unintentionally causing a death while acting recklessly with respect to the possibility that their conduct would cause death. When the underlying crime is defined in terms of an unintended result, what does AS 11.16.110(2) mean by the phrase "intent to promote or facilitate the commission of *the offense* "?

In *Echols,* this Court interpreted the complicity statute in the context of a prosecution for first-degree assault, a crime that requires proof that the defendant acted recklessly with respect to a prohibited result (infliction of serious physical injury). We held that even though a person could be convicted of first-degree assault as a principal upon proof that they acted recklessly with respect to the prohibited result, a person could not be convicted as an accomplice unless the State proved a different, higher culpable mental state. Specifically, we held that whenever the underlying crime requires proof of a particular result, the statutory requirement that an accomplice "inten[d] to promote or facilitate the commission of the offense" means that the State must prove that the

defendant acted "intentionally" with respect to this prohibited result.[6]

While this construction of the statute may have seemed plausible under the facts of *Echols* (which we discuss in more detail below), it leads to counter-intuitive results in situations like the one presented in Riley's appeal.

For example, let us assume that Riley and Portalla engaged in the same conduct (jointly firing weapons into a crowd) but, through misfortune, one of their victims was killed. Let us further assume that the State believed that it was impossible to prove, beyond a reasonable doubt, that this death was intended, so the State charged both defendants with manslaughter. And finally, let us assume that the evidence linking the homicide to either Riley's or Portalla's personal conduct was so inconclusive that it was impossible to say, beyond a reasonable doubt, which of them was the principal and which the accomplice.

Under the rule of *Echols,* neither Riley nor Portalla can be convicted of manslaughter in this hypothetical situation. The State can prove that both defendants acted recklessly with respect to the possibility that their conduct would cause human death, and this culpable mental state would be sufficient to establish the *principal's* guilt of manslaughter. But the State can not prove (beyond a reasonable doubt) which of the defendants was the principal. This means that the State will have to prove both defendants' guilt under a complicity theory. And *Echols* holds that, to prove guilt under a complicity theory, the State has to prove that the defendants acted with the intent to kill. In effect, *Echols* says that, under these circumstances, the State has to prove the defendants guilty of first-degree murder (intentional taking of human life) or the defendants will escape criminal liability for the homicide.

*(b)* The Echols *rule departs from the common-law rule*

*Echols* has not found favor among legal scholars. See, for example, the article by Audrey Rogers, "Accomplice Liability for Unintentional Crimes", 31 Loyola of Los An-

---

6. *Echols,* 818 P.2d at 694–95.

geles Law Review 1351 (1998), which cites *Echols* as an example of an overly narrow interpretation of the *mens rea* required for accomplice liability.[7] And, indeed, *Echols* represents a distinctly minority view on this issue.[8]

This is not to say that other states impose accomplice liability without proof of *mens rea*. Quite the opposite. It is universally acknowledged that accomplice liability can not be based solely on the fact that a person's words or actions *had the effect* of encouraging or assisting another to commit a crime. The government must also prove, at a minimum, that the accomplice provided the encouragement or assistance with knowledge of the other person's criminal design. Many common-law decisions and many complicity statutes (such as Alaska's) require the government to prove, not only that the defendant knew of the other person's criminal design, but also that the defendant intended to further that criminal design. As stated in *Perkins & Boyce,*

> Aid or encouragement to another who is actually perpetrating a felony will not make the aider or encourager guilty of the crime if [the aid or encouragement] is rendered without *mens rea* [—that is,] if the giver does not know or have reason to know of the criminal intention of the other.... For guilt as [an accomplice,] it is necessary that the acts [of assistance] or words of encouragement be employed with that intent.... In general[,] it is the abettor's state of mind rather than the state of mind of the perpetrator which determines the abettor's guilt or innocence[.]

Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd ed.1982), p. 743. *LaFave & Scott* states the same rule:

> Under the usual requirement that the accomplice must intentionally assist or encourage, it is not sufficient that he [purposely] engaged in acts which, as it turned out, did give assistance or encouragement

to the principal. Rather, the accomplice must intend that his acts have the effect of assisting or encouraging another.

Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* (1986), § 6.7(c), Vol. 2, p. 143.

The common-law courts were split as to whether an act of encouragement or assistance, combined with mere *knowledge* of another person's criminal design—as opposed to an intent to promote or facilitate the other person's criminal design—was sufficient to establish complicity. ˙Courts would sometimes hold defendants liable as accomplices to treason or other heinous felonies merely upon a showing that the defendant knowingly provided assistance to the traitor or the felon. But the courts generally held that knowledge was not enough—that complicity required proof of the defendant's purpose to advance the criminal activity—when the underlying crime was less serious. *See Perkins & Boyce,* pp. 745–48; *LaFave & Scott,* § 6.7(d), Vol. 2, pp. 145–48.

An early draft of the Model Penal Code would have allowed complicity to be established by proof that the defendant provided aid or encouragement with *knowledge* of the other person's intended criminal venture, even though the defendant lacked an accompanying purpose to promote or facilitate that criminal venture. But this provision was removed from the Model Penal Code after debate. *See Perkins & Boyce,* p. 748; *LaFave & Scott,* § 6.7(d), Vol. 2, p. 148.[9]

But here we reach the critical question: If a defendant provides aid or encouragement to another, acting not only with knowledge of the other person's intention to engage in unlawful or dangerous conduct, but also with the intent to promote or facilitate that unlawful or dangerous conduct, can the defendant be held accountable as an accomplice for a crime arising from the unintended consequences of that conduct? At common law, the answer is "yes".

---

7. *Rogers, supra* at 1369.

8. *See* Joshua Dressler, *Understanding Criminal Law* (1995), pp. 442–43 n. 81.

9. But compare Washington Statute 9A.08.020(3)(a), a complicity statute that rejects

the "intent" requirement of the Model Penal Code and instead imposes accomplice liability if a person solicits, encourages, or aids the planning or commission of a crime "[w]ith knowledge that [their conduct] will promote or facilitate the commission of the crime".

The rule at common law is that when a person purposely assists or encourages another person to engage in conduct that is dangerous to human life or safety, and unintended injury or death results, it does not matter which person actually caused the injury or death by their personal conduct. Any participant can be convicted of assault or manslaughter (or any similar crime involving proof of an unintended result) so long as the government can prove that the participant acted with the culpable mental state required for the underlying crime—"recklessness", "criminal negligence", "extreme indifference to the value of human life", etc.

For example, as noted in *Perkins & Boyce*, "[t]hose present at an unlawful fist fight [who] encourage continued blows by shouts or gestures ... will be guilty of manslaughter if death should ensue." [10] *See People v. Terry*, 99 Ill.2d 508, 77 Ill.Dec. 442, 460 N.E.2d 746 (1984), holding that, under the common law, when a group of men conspire to commit a battery, and the battery leads to the death of the victim,

> [e]ach person ... [is] responsible for the conduct of the other[s] ... done in furtherance of the intended battery. [If the] result of their concerted acts was murder ..., all are legally accountable for that murder.

*Terry*, 77 Ill.Dec. 442, 460 N.E.2d at 749. *Accord, Carlisle v. State*, 36 Ala.App. 241, 58 So.2d 638, 640 (1951) (holding a defendant guilty of manslaughter when he participated in an assault that left the victim dead).

Similarly, if two drivers engage in an unlawful race on a public highway, thus encouraging each other to drive recklessly, both will be guilty of manslaughter if one of them strikes and kills a third person.[11] *See, e.g., People v. Abbott*, 84 A.D.2d 11, 445 N.Y.S.2d 344 (1981); *Jones v. Commonwealth*, 247 S.W.2d 517 (Ky.1952).

And courts applying the common law frequently hold that a person who knowingly allows and encourages an intoxicated person to drive a car can be held liable as an accomplice to manslaughter if the intoxicated person kills someone.[12] Thus, in *State v. Whitaker*, 43 N.C.App. 600, 259 S.E.2d 316 (1979), the court stated:

> [W]hen [unintended] death results from the operation of a motor vehicle by an intoxicated person ..., [and] the owner [of the vehicle] is present in the vehicle and ... with his knowledge and consent permits the intoxicated person to operate the vehicle[, the owner] is as guilty [of manslaughter] as the intoxicated driver.

*Whitaker*, 259 S.E.2d at 319. *Accord, State v. Morris*, 224 Tenn. 437, 456 S.W.2d 840, 846 (1970) [13]; *Lewis v. State*, 220 Ark. 914, 251 S.W.2d 490, 493–94 (1952); *Story v. United States*, 16 F.2d 342, 344 (D.C.App.1926); *Ex parte Liotard*, 47 Nev. 169, 217 P. 960, 961 (1923).

Another example of the common-law rule of complicity is *Black v. State*, 103 Ohio St. 434, 133 N.E. 795 (1921), a case in which several police officers decided to test their marksmanship by shooting at a target at the back of a saloon. One of the shots (it was impossible to tell which one) passed through the saloon wall and killed a passerby. The Ohio Supreme Court ruled that all of the participating officers were criminally responsible for the unintended death:

> Where men combine either by express agreement or by actual conduct in the commission of an unlawful act ... [,] each and all of those so participating are held equally liable for any and all of the proximate results that could naturally and reasonably be anticipated....

*Black*, 133 N.E. at 797.

In another case, *Ritzman v. People*, 110 Ill. 362 (1884), 1884 WL 9892, a group of young men trespassed into an orchard to steal apples. When the land owner confronted them, they stoned him with hard clods of earth. One of these missiles hit the land owner in the head, killing him. It could not be determined which of the assailants struck

---

**10.** *Perkins & Boyce*, pp. 739–740.

**11.** *Id.* at 740.

**12.** *LaFave & Scott*, § 6.7(e), Vol. 2, p. 149.

**13.** Overruled on other grounds in *State v. Anderson*, 937 S.W.2d 851 (Tenn.1996).

the fatal blow. The Illinois Supreme Court held that any of the participants who purposely encouraged or assisted the battery could properly be convicted as an accomplice to involuntary manslaughter:

> [W]e think it is wholly immaterial whether the missile in question was thrown by the hand of the accused or of some one of his co-trespassers. That the defendant was present—and, to say the least of it, encouraging the perpetration of the offense—can not be denied.... [By encouraging] the offense, ... he is made a principal, and equally guilty with the one who personally gave the fatal blow.

*Ritzman,* 1884 WL at *4.

The same result was reached in *State v. Guyton,* 635 S.W.2d 353 (Mo.App.1982), a case in which the defendant participated in an assault on the victim, resulting in the victim's death. The court upheld the defendant's conviction for manslaughter under a complicity theory. The court explained,

> [T]he defendant's liability for manslaughter is not dependent upon her intent to promote the commission of manslaughter. Her liability stems from her intent to aid and abet the assault out of which the manslaughter arose.... If the defendant aids the actor in an assault, with the intent to promote that offense, and the actor unintentionally kills the victim, then the defendant is liable for manslaughter as an aider and participant.

*Guyton,* 635 S.W.2d at 358.

Similarly, in *People v. Bolden,* 59 Ill. App.3d 441, 16 Ill.Dec. 791, 375 N.E.2d 898 (1978), a group of men were each convicted of involuntary manslaughter based on evidence that, acting together, they fired some 15 to 20 shots into the first-floor breezeway of an apartment building. Two of these shots struck a woman who lived in the building, killing her. It could not be determined which weapon or weapons fired the fatal bullets.[14]

The court acknowledged that, under the common law of Illinois, "[t]o be accountable for the acts of another, one must have a specific intent to promote or facilitate the commission of a crime".[15] However, the court ruled, "To be guilty of involuntary manslaughter[,] one need not intend that death ensue from his reckless acts, as the only mental state required is a conscious disregard of a substantial and unjustifiable risk that death or great bodily harm will be the result of such acts." [16] The court concluded that a person could be convicted as an accomplice to involuntary manslaughter if the person intentionally abetted someone else's reckless conduct, consciously disregarding a substantial and unjustifiable risk that this conduct would result in death or great bodily injury.[17] Thus, if the government showed that a defendant purposely encouraged or aided the shooting spree, acting with conscious disregard of a substantial and unjustifiable risk that the shooting spree would cause someone's death, that defendant could properly be convicted of involuntary manslaughter under a complicity theory.[18]

> *(c) The Echols rule departs from the interpretation adopted by other states whose complicity statutes, like Alaska's, are based on the Model Penal Code*

Alaska's complicity statute is based on Model Penal Code § 2.06(3). This section reads:

> A person is an accomplice of another person in the commission of an offense if:
>
> (a) with the purpose of promoting or facilitating the commission of the offense, he
>
> > (i) solicits [the] other person to commit it, or
> >
> > (ii) aids or agrees or attempts to aid [the] other person in planning or committing it, or
> >
> > (iii) having a legal duty to prevent the commission of the offense, fails to make proper effort to do so[.]

---

14. *Bolden,* 16 Ill.Dec. 791, 375 N.E.2d at 901, 904.

15. *Id.* at 903.

16. *Id.*

17. *Id.*

18. *Id.* at 904.

In the Model Penal Code, this provision is immediately followed by § 2.06(4), a section which addresses the legal issue at the heart of this appeal: the culpable mental state required to establish a person's complicity in an offense involving a particular prohibited result. Section 2.06(4) reads:

> When causing a particular result is an element of an offense, an accomplice in the conduct causing [that] result is an accomplice in the commission of that offense if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

Professor LaFave discusses these two sections of the Model Penal Code in § 6.7(e) of his treatise on criminal law, but his discussion is—uncharacteristically—illogical. LaFave begins his discussion by raising the issue of whether the owner of a car can be held accountable as an accomplice to involuntary manslaughter if the owner knowingly permits an intoxicated driver to use the car, and the intoxicated driver kills someone. Professor LaFave acknowledges that courts have often upheld convictions in these and other related circumstances:

> [I]t has been held with some frequency that accomplice liability [for involuntary manslaughter] exists under [these] circumstances[.] The most common case [involves] the example given above[, in which] a car owner has permitted a person known to be intoxicated to operate his vehicle, but the same result has been reached on quite different facts.

*LaFave & Scott,* § 6.7(e), Vol. 2, pp. 149–150. The author then offers a footnote that cites cases in which defendants were held liable as accomplices to manslaughter for purposely assisting people who were engaged in other life-threatening activities. He then offers a rationale for these court decisions:

> [T]he assumption [of these cases] apparently is that giving assistance or encouragement to [some]one [who] it is known will thereby engage in conduct dangerous to life should suffice for accomplice liability as to crimes defined in terms of recklessness or negligence. This conclusion [is]

permitted under some accomplice liability statutes[.]

*Id.* In the footnote that accompanies this text, Professor LaFave cites § 2.06(4) of the Model Penal Code as a statute that would impose accomplice liability in this situation. He quotes the Commentary to § 2.06(4), which states that this section codifies the rule that a person "who urges a driver to increase his speed [to an unsafe level] stands in the same position as the driver if a homicide or injury occurs". *Id.,* n. 110.

Then Professor LaFave makes an illogical statement:

> This theory of accomplice liability ... would seem inapplicable under many of the modern accomplice statutes [that follow Model Penal Code § 2.06(3) by] requiring an actual intent to assist the commission of a crime.

*Id.,* pp. 150–51.

This statement is illogical because it appears to be premised on the idea that Model Penal Code § 2.06(3) and Model Penal Code § 2.06(4) codify contradictory rules of accomplice liability. But the Model Penal Code was drafted as a unified whole, not as a menu of alternative formulations of the law. The drafters of the Model Penal Code obviously thought that § 2.06(3) was harmonious with § 2.06(4).

The explanatory note to Model Penal Code § 2.06 states that subsection (4) "deals with a special case that arises when an actor is an accomplice in conduct within the meaning of [§ 2.06(3)], and when a criminal result—anticipated or unanticipated—flows from that conduct." [19] In fact, the Model Penal Code commentary explains that §§ 2.06(3) and 2.06(4) were intended to be read together: § 2.06(3) defines the *conduct* for which an accomplice can be held accountable, while § 2.06(4) clarifies that, when that conduct produces a result prohibited by law, the accomplice's culpable mental state with respect to that result (and, thus, the accomplice's guilt or innocence, or the accomplice's degree of guilt) must be evaluated separately from anyone else's culpable mental state.

---

**19.** American Law Institute, *Model Penal Code and Commentaries (Official Draft and Revised Comments)* (1985), explanatory note to § 2.06, p. 297.

One of the primary aims of the Model Penal Code's approach to accomplice liability was to leave behind the common-law concepts of principals and accessories, and to have a person's criminal liability rest on conduct—either conduct that they performed personally or conduct of another person for which they can be held accountable under the various complicity provisions of § 2.06.[20]

In conformity with this approach, the commentary to § 2.06(3) explains that the language requiring an accomplice to act "with the purpose of promoting or facilitating the commission of the offense" actually refers to the accomplice's "conscious objective [of] bringing about ... *conduct* that the Code has declared to be criminal".[21] According to this commentary, an accomplice "must have the purpose to promote or facilitate *the particular conduct that forms the basis of the charge*."[22] (As we explain below, this is generally how the phrase has been interpreted in those states that have adopted the Model Penal Code formulation of complicity.)

The sibling provision, § 2.06(4), was designed to clarify the scope of accomplice liability that might otherwise follow from § 2.06(3). Rejecting the notion that an accomplice should be held accountable for any and all objectively foreseeable results of the principal's conduct[23], the drafters of the Model Penal Code codified the rule that even though several defendants are accountable for the same criminal conduct under § 2.06(3), each defendant's level of culpability with respect to the results of that conduct must be assessed separately, based on each individual's culpable mental state:

> Subsection (4) makes it clear that complicity in conduct causing a particular criminal result entails accountability for that result so long as the accomplice is personally culpable with respect to the result to the extent demanded by the definition of the crime. Thus, if the accomplice recklessly endangers life by rendering assistance to another, he can be convicted of manslaughter if death results, even though the principal actor's liability is at a different level. In effect, ... the homicidal act is attributed to both participants, with the liability of each [participant] measured by his own degree of culpability toward the result.

Model Penal Code, Comment to § 2.06(4), p. 321. In an accompanying footnote (footnote 70), the Comment explains that a defendant's complicity in an unintended homicide would not require proof of intent to kill, but rather proof that the defendant acted with the culpable mental state required for the underlying crime:

> A manslaughter prosecution could be brought on the theory that the defendant consciously disregarded a substantial and unjustifiable risk that death would result from the assisted conduct ... [or a] murder prosecution could be brought on the theory that the defendant was ... reckless under circumstances manifesting extreme indifference to the value of human life.

When we examine court decisions from states that have complicity statutes modeled after § 2.06(3) of the Model Penal Code (statutes requiring that an accomplice act with the "intent" or the "purpose" of promoting or facilitating the offense)[24], we find that the great majority have rejected Professor LaFave's suggestion that this phrase precludes accomplice liability unless the government proves that the defendant intended to cause the prohibited result. Instead, these states have interpreted their statutes in conformity with the Model Penal Code commentary.

---

**20.** Model Penal Code, Comment to § 2.06, "General Purpose", p. 298.

**21.** Model Penal Code, Comment to § 2.06(3), p. 310 (emphasis added).

**22.** *Id.*, pp. 310–11 (emphasis added).

**23.** *Id.*, pp. 311–13.

**24.** Alabama Statute § 13A–2–23; Arizona Statute § 13–301; Arkansas Code § 5–2–403; Colorado Statute § 18–1–603; Delaware Code, Title 11, § 271; Hawai'i Statute § 702–222; Illinois Code, Chapter 720, Art. 5, § 5–2; Kentucky Statute § 502.020; Maine Statutes, Title 17–A, § 57; Montana Code § 45–2–302; New Hampshire Statute § 626:8, III; New Jersey Statute § 2C:2–6; Oregon Statute § 161.155; Pennsylvania Statutes, Title 18, § 306; South Dakota Codified Law § 22–3–3; Texas Penal Code § 7.02.

In particular, with respect to offenses that involve a resulting injury or death, these courts hold that accomplice liability requires proof (1) that the accomplice intended to promote or facilitate another's unlawful or dangerous *conduct,* and (2) that the accomplice acted with the culpable mental state specified in the underlying statute with respect to the resulting injury or death. Thus, these courts uphold accomplices' convictions for unintended criminal homicides—*e.g.,* "extreme indifference" murder or reckless manslaughter—based on proof that the accomplice, acting with the culpable mental state required for the underlying crime, purposely encouraged or aided another person to engage in conduct that posed a substantial and unjustifiable danger to human life.

For example, the Alabama case of *Ex Parte Simmons,* 649 So.2d 1282 (Ala.1994), involved a fact situation quite similar to the facts of Riley's case. The defendant, Simmons, was one of a group of men who recklessly fired weapons toward a crowd of people. A three-year-old child was struck by a bullet and killed. The State's expert witness testified that the fatal bullet "could have been fired from any of the revolvers and semi-automatic pistols that were used in the shoot-out". That is, "it could not be determined ... which of the men fired the fatal shot." [25]

Because the government could not prove which of the men fired the fatal shot, the government prosecuted Simmons for "reckless murder" under a theory of accomplice liability. (The Alabama crime of "reckless murder" is the equivalent of second-degree murder under AS 11.41.110(a)(3): that is, Simmons was convicted of killing another person while engaged in conduct "manifesting extreme indifference to human life".) [26] The government's theory was that Simmons purposely encouraged or aided the reckless conduct that resulted in the death of the child.

The Alabama Court of Criminal Appeals reversed Simmons's conviction; *see Simmons v. State,* 649 So.2d 1279 (Ala.Crim.App.

1992). Essentially, the appeals court adopted the same reasoning that this Court adopted in *Echols:* a person can not "intend[ ] to promote or assist the commission of reckless conduct". [27] But the Alabama Supreme Court disagreed and reinstated Simmons's murder conviction:

> Accomplice liability does not require that the accomplice intend for the principal to act in a reckless manner. Rather, accomplice liability requires only that the accomplice intend to promote or to assist the principal, having knowledge that the principal is engaging in, or is about to engage in, criminal conduct. See [Alabama Statute] § 13A-2-23, Committee Comments. The mental state required for complicity is the intent to aid the principal in the criminal act or conduct, not the intent of the principal that death occur either intentionally or recklessly. In other words, for a person to be guilty of reckless murder as an accomplice, he need not know or decide whether the principal will act intentionally or recklessly; rather, the accomplice need only have knowledge that the principal is engaging in reckless conduct and intentionally assist or encourage that conduct with the intent to promote or facilitate its commission.

*Ex Parte Simmons,* 649 So.2d 1282, 1284–85 (Ala.1994) (citations omitted).

The Texas Court of Criminal Appeals reached the same result on analogous facts in *Mendez v. State,* 575 S.W.2d 36 (Tex.Crim. App.1979). In *Mendez,* the defendant and two friends went drinking, armed themselves, and fired several shots at two cars. Then one of the defendant's companions began shooting randomly at houses. One of these shots killed a home owner who was asleep in bed. The Texas court held that the defendant was properly convicted of involuntary manslaughter under a complicity theory because the defendant "intentionally solicit[ed] or assist[ed] an individual in committing a reckless act." *Id.* at 38.

In *People v. Novy,* 232 Ill.App.3d 631, 173 Ill.Dec. 565, 597 N.E.2d 273 (1992), the court

**25.** *Simmons,* 649 So.2d at 1283.

**26.** *Id.* at 1283.

**27.** *Simmons,* 649 So.2d at 1281.

construed its Model Penal Code-based complicity statute to allow the defendant's conviction for reckless murder based on facts somewhat analogous to the facts of *Echols*. The court stated:

> It need not be shown that the defendant had a specific intent to kill or participated in a preconceived plan to commit murder. Where there is a common design to participate in an illegal act, such as aggravated battery to a child, and death occurs during the prosecution of the common objective, all participants are guilty of murder. Such a common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct such as: presence at the scene of the crime without disapproval or opposition; a continued close association with the perpetrator after the criminal act; a failure to report the incident to the authorities; and/or the subsequent concealing or destroying of evidence of the crime.... The defendant's acts need only have contributed to the death, and the defendant may be accountable even though he had no intent to and did not personally kill the victim.

In the instant case, even if it is assumed that defendant did not inflict the fatal blows on James, she admitted that she did hit James in the head, beat him with a belt, and inflicted other forms of abuse on him. Furthermore, she was aware of the severity of the beatings inflicted on James by Keith Novy. She told the police on December 2, 1989 that just two weeks before James' death, Keith struck the two children's heads together so hard that defendant heard it in the kitchen. It was after this that James began to show signs of severe head injury. Defendant was also aware that Keith had at least threatened James with a baseball bat, and it is not an unreasonable inference from all the evidence that Keith hit James in the head with the bat and defendant knew this. Defendant was well aware of the severity of James' injuries. Despite this, defendant continued to associate with Keith Novy, she did not inform the authorities of the batteries upon James, despite numerous opportunities to do so, and she even concealed the evidence of the offense by making excuses for James' injuries and absences. We think that the evidence is sufficient to support a finding of a common design to batter the victim and that a [reckless murder] conviction based upon a theory of accountability is supported by the evidence.

*Novy*, 173 Ill.Dec. 565, 597 N.E.2d at 295–96.

Similarly, in *People v. Taylor*, 199 Ill. App.3d 933, 145 Ill.Dec. 938, 557 N.E.2d 917 (1990), the court upheld the defendant's conviction for involuntary murder based on evidence that she purposely assisted two other men in their planned assault on the victim. The court said: "Although it is not clear whether the defendant intended for Taylor and Brazelton to kill Boldin, it is clear that she played an integral part in the plan by delivering him to the perpetrators knowing that some harm would come to him. This, we believe, is all that is necessary for making her legally responsible for the acts of Taylor and Brazelton."[28] Another Illinois appeals court reached the same result in *People v. Cole*, 253 Ill.App.3d 603, 192 Ill.Dec. 661, 625 N.E.2d 816, 820–21 (1993) (holding that the defendant was properly convicted of involuntary murder when he acted to further an assault on the victim, from which the victim died).

In *Hooks v. State*, 416 A.2d 189 (Del.1980), the Delaware Supreme Court held that the defendant was properly convicted of first-degree murder (reckless murder in the commission of a felony) based on evidence that the defendant purposely participated in the underlying felony and acted with recklessness regarding the possibility that someone might die. The court declared that, under Delaware's complicity statute (based on the Model Penal Code), accomplice liability did not depend on "whether each accomplice had the specific intent to commit murder", but whether the accomplice "intended to promote or facilitate the principal's *conduct* constituting the offense. The defendants did not have

---

**28.** *Taylor,* 145 Ill.Dec. 938, 557 N.E.2d at 922–23.

to specifically intend that the result, a killing, should occur." [29]

The *Hooks* court construed its complicity statute in this manner because the court concluded that the Delaware legislature had intended to codify the pre-existing law of complicity and because, under both the common law and prior Delaware law, accomplices "did not have to specifically intend ... the result".[30]

In *People v. Wheeler*, 772 P.2d 101 (Colo. 1989), the Colorado Supreme Court reached the same interpretation of its Model Penal Code-based complicity statute. The court upheld the defendant's conviction as an accomplice to criminally negligent homicide, over the defendant's objection that a person can not "intend" an unintentional killing. The court explained that the language of the complicity statute, "intent to promote or facilitate the commission of the offense", means that an accomplice must act with

> intent to promote or facilitate the act or conduct of the principal. This language does not require that the [accomplice] intend for the principal to cause death.

*Wheeler*, 772 P.2d at 103. The court reaffirmed this interpretation of the complicity statute in *Bogdanov v. People*, 941 P.2d 247 (Colo.1997):

> The principle we enunciated in *Wheeler* is that when [an accomplice] intentionally assists or encourages another whom the [accomplice] knows will thereby engage in conduct that grossly deviates from the standard of reasonable care and poses a substantial and unjustifiable risk of death to another, such a mental state should suffice for complicity liability for an underlying crime defined by the culpable mental states of recklessness or negligence.

*Bogdanov*, 941 P.2d at 251.

*Accord, State v. Locke*, 144 N.H. 348, 761 A.2d 376, 379 (1999) (holding that a defendant who purposely aided a friend in beating another man was properly convicted as an accomplice to "extreme indifference" murder

when the victim died); *State v. Goodall*, 407 A.2d 268, 278 (Maine 1979) (holding that a defendant who intentionally participated in an assault was properly convicted as an accomplice to manslaughter when another assailant caused the victim's death); *Commonwealth v. Bridges*, 475 Pa. 535, 381 A.2d 125, 128 (1977) (upholding the defendant's conviction for reckless murder when the defendant participated in a group attack on the victim; during the assault, one of the other assailants drew a knife and stabbed the victim, and the victim later died from this wound).

*(d) Based on the foregoing, we conclude that Echols was wrongly decided*

Alaska's complicity statute, AS 11.16.110(2), is based on Model Penal Code § 2.06(3). It specifies that a person can be held accountable for the conduct of another if the person (1) solicits that conduct, encourages the conduct, or assists in planning or performing the conduct, and (2) when doing so, the person acts "with intent to promote or facilitate the commission of the offense". The task facing this Court in *Echols* was to interpret what the drafters of Alaska's Criminal Code meant by "the offense". Do these words refer to the accomplice's intent to promote or facilitate the other person's conduct? Or do these words refer to the accomplice's intent to promote or facilitate the other person's conduct *and* ensuing result? We ultimately adopted the latter interpretation in *Echols*—concluding that whenever the elements of an offense include a particular result, a person can not be convicted as an accomplice to that offense unless they consciously intended to achieve that result.[31] Our decision in *Echols* rests on two foundations.

First, we acknowledged that the drafters of AS 11.16.110(2) intended to codify Alaska's pre-existing law on this subject.[32] To ascertain that pre-existing law, we examined two pre-code decisions of the Alaska Supreme Court: *Hensel v. State*, 604 P.2d 222 (Alaska 1979), and *Tarnef v. State*, 512 P.2d 923 (Alaska 1973). We concluded that these two

---

29. *Hooks*, 416 A.2d at 197 (emphasis added).

30. *Id.*

31. *Echols*, 818 P.2d at 694–95.

32. *See* Alaska Criminal Code Revision, Tentative Draft, Part 2 (1977), p. 31.

decisions stood for the principle that, to establish complicity in a crime requiring proof of a particular result, the government must prove that the accomplice intended to further or achieve the result specified in the underlying criminal statute. But we misread these two cases.

*Hensel* is not relevant to the issue presented in *Echols*. Instead, *Hensel* dealt with a different aspect of complicity: the problem of whether a person can be held liable as an accomplice if they furnish money, tools, supplies, or other physical aid to another person, *knowing* that this other person intends to use these things in criminal activity, but without *intent* to promote or facilitate that criminal activity. . As already discussed in this opinion, the common-law courts were divided on this issue, with the majority holding that knowledge was not enough, and that intent to promote the criminal activity was required.

In *Hensel*, the supreme court adopted the majority common-law rule, holding that knowledge of the other person's planned criminal activity is not enough to establish complicity—that an accomplice "must also have had the specific criminal intent to bring about the illegal end".[33] But, in context, the supreme court was only clarifying that the government must prove that the supplier of aid acted with the intent to promote the success of the criminal venture. The supreme court declared that its purpose was to have Alaska adhere to "the generally accepted rule" concerning the furnishing of aid to those who are known to be engaged in criminal conduct.[34]

In other words, *Hensel's* language about "intent to bring about [an] illegal end" was not addressed to the issue presented in *Echols*—the issue of whether a defendant who assists or encourages illegal conduct, and intends to promote or facilitate that illegal conduct, can be convicted of a crime based on the unintended results of that conduct if the State proves that the defendant acted with the culpable mental state specified in the statute defining the crime. In fact,

the supreme court said in footnote 48 of *Hensel* that it was leaving this issue open:

> We need not reach the issue of whether in some cases a less specific criminal intent would suffice -- for example, whether a defendant who furnished a weapon to aid in a robbery could be found guilty if the weapon were used to murder rather than to rob the intended victim. We also need not decide whether a defendant who furnishes a weapon with the intent that it be used for criminal purposes, but without knowledge as to the particular crime to be perpetrated, could be found guilty as an accomplice.

*Hensel*, 604 P.2d at 234 n. 48.

This leaves *Tarnef*. *Tarnef* states that "[i]t is well established at common law and in Alaska that a person cannot be convicted of 'aiding and abetting' a crime unless it is shown that he had the specific criminal intent to bring about the illegal end."[35] In *Echols*, we focused on the phrase, "intent to bring about the illegal end". We interpreted this phrase to mean that, under the common law and the pre 1980 law of Alaska, a person could not be convicted as an accomplice to a crime requiring proof of a particular result unless the person acted with the intent to promote or facilitate the achievement of that "end" or result. But, on closer inspection, this isolated phrase from *Tarnef* does not stand for this proposition.

The defendant in *Tarnef* was accused of complicity in second-degree arson under Alaska's former criminal code. This crime was defined as willfully and maliciously setting fire to a structure. (See former AS 11.20.020, quoted in *Tarnef*, 512 P.2d at 927.) That is, the crime was defined solely in terms of conduct; it did not require proof of any result. Thus, when the supreme court required proof of the defendant's "specific criminal intent to bring about the illegal end", they were talking about Tarnef's intent to aid or encourage someone else's *conduct*— the act of setting fire to a building.

33. *Hensel*, 604 P.2d at 234.

34. *Id.*

35. *Tarnef*, 512 P.2d at 928 (quoted in *Echols*, 818 P.2d at 692).

In fact, another portion of the *Tarnef* decision contains a more accurate description of the complicity rule. This description appears on the next page of the opinion, when the supreme court announces its holding that Alaska's complicity statute will be construed to incorporate the common-law requirement of criminal intent:

> It is clear that at common law criminal intent was a necessary element of liability as an aider and abettor. [footnote 7] Although Alaska now treats aiders and abettors as principals, the common law intent requirement remains. Accordingly, we hold that although intent is not specifically mentioned in the portion of the second degree arson statute which refers to one who "aids, counsels or procures the burning of a building", criminal intent is required as a necessary element of the crime.

*Tarnef*, 512 P.2d at 929 (footnote 8 omitted).

One of the footnotes that accompanies this text—footnote 7—is crucial to understanding what the supreme court meant when it declared that Alaska would continue to apply the common law rule that "criminal intent [is] a necessary element of [accomplice] liability". This footnote is quite short; it reads: "*E.g., Peats v. State*, 213 Ind. 560, 12 N.E.2d 270, 277 (Ind.1938)". But the Alaska Supreme Court's approving citation of *Peats* demonstrates that *Tarnef* does not stand for the rule of law that we adopted in *Echols*.

The defendant in *Peats* was convicted of manslaughter based on evidence that he either encouraged or perhaps personally aided a group of other men who committed an unlawful assault on the victim. The assailants chased the victim's truck down the highway, overtook and passed it, then turned around and raced back. Approaching the victim's truck at 70 miles per hour, the assailants threw rocks and pieces of concrete at the truck. The victim lost control of his vehicle and crashed, suffering injuries that ultimately proved fatal.[36]

The defendant in *Peats* argued that even if he encouraged or assisted the unlawful attack on the victim, he still could not be convicted of manslaughter because "there can be no aiders or abettors in the crime of involuntary manslaughter". The defendant asserted that "when a person is [unintentionally] killed in the commission of an unlawful act, only the one actually perpetrating the [homicide] can be guilty".[37] But the Indiana Supreme Court rejected this view of the law and held that Peats's purposeful encouragement of, or participation in, the unlawful assault was sufficient to establish his complicity in the resulting homicide:

> [The assailants shared a] common design or purpose to commit the unlawful assault and battery, and the one who [actually accomplished the killing] had no more purpose and design of killing than the others when they entered together upon the common undertaking, the assault and battery. The purpose of each was the purpose of all, and the act of each, in pursuance of the common design, was the act of all. The one who actually accomplished the killing intended only the assault and battery, and those who assisted in the assault and battery intended it as much as he. Guilt of involuntary manslaughter is predicated upon the intentional doing of the unlawful act, and not upon intention to kill.

*Peats*, 12 N.E.2d at 277.

Given the holding in *Peats*, and given the Alaska Supreme Court's approving citation of *Peats* in footnote 7 of *Tarnef*, it is clear that we misinterpreted *Tarnef* (and the pre-existing law of Alaska) in *Echols*. *Tarnef* reiterates the well-established common law rule that, even though a person may have assisted or encouraged a criminal act, they can not be held liable as an accomplice unless they did so with criminal intent. That is, an accomplice must intend to promote the "illegal end"—if that phrase is understood to mean the intended unlawful *conduct*, such as the unlawful burning in *Tarnef* or the assault in *Peats*. But, as illustrated by the decision in *Peats*, when the charged crime rests on proof of unlawful or dangerous conduct followed by an unintended result (such as injury or death), there is no common-law requirement

---

**36.** *Peats*, 12 N.E.2d at 273–75.

**37.** *Id.* at 277.

that an accomplice subjectively intend to cause this result.

Thus, the first basis for our decision in *Echols*—our conclusion that Alaska's pre-code law required proof of an accomplice's subjective intent to promote or facilitate a particular result—is erroneous.

The second basis for our decision in *Echols* was our adoption of Professor LaFave's suggestion that complicity statutes based on Model Penal Code § 2.06(3) are intended to prohibit accomplice liability for any crime involving a particular result unless the government proves that the accomplice acted "intentionally" with respect to that result.

But as we have already discussed, this suggestion is contradicted by the pertinent Model Penal Code commentary, and it has been rejected by most courts with Model Penal Code-based complicity statutes. The standard interpretation of the phrase "intent to promote or facilitate the commission of the offense" is that it requires proof of the accomplice's intent to promote or facilitate another person's *conduct* that constitutes the *actus reus* of the offense. With regard to the results of that conduct, the government must prove that the accomplice had whatever culpable mental state is required for the underlying crime.

It is true, as we pointed out in *Echols*, that our criminal code contains a provision, AS 11.16.110, based on Model Penal Code § 2.06(3), but it does not contain a provision based on Model Penal Code § 2.06(4)—no provision expressly providing that, when a statute requires proof of a particular result and specifies an accompanying culpable mental state, the government must prove that an accomplice acted with that culpable mental state. In *Echols*, we took this omission to mean that the drafters of Alaska's criminal code disagreed with the principle of Model Penal Code § 2.06(4), and that they wanted to require a higher culpable mental state— "intentionally"—whenever a defendant was prosecuted under a complicity theory.[38]

But this reasoning rests on the same illogical premise that we described previously— the premise that Model Penal Code § 2.06(3) and Model Penal Code § 2.06(4) are fundamentally at odds, each embodying a different rule of accomplice liability. As the Model Penal Code commentary explains, this is not the case. The two sections were intended to complement each other: subsection (3) describes the circumstances in which one person can be held accountable for another person's *conduct*, and subsection (4) explains that, even though two or more people may be accountable for the conduct constituting an offense, each person's *culpable mental state* must be evaluated separately.

Although the drafters of our criminal code did not explain why they did not codify Model Penal Code § 2.06(4), it does not make sense to interpret their decision as an indication that they wanted to restrict accomplice liability to instances where the accomplice acted "intentionally" with respect to a result. First, the drafters expressly stated that they intended AS 11.16.110(2) to codify Alaska's pre-existing law on this subject, and—as we have just explained—no such rule is found in Alaska's pre-code decisions. Second, the Model Penal Code commentary clearly states that §§ 2.06(3)-(4) were intended to authorize accomplice-liability convictions for crimes such as second-degree murder or manslaughter upon proof that (1) the accomplice intentionally promoted or facilitated another person's dangerous *conduct*, (2) an unintended death resulted, and (3) the accomplice acted with the culpable mental state required for the underlying crime. If the drafters of our criminal code had intended to discard this basic principle of the Model Penal Code's section on accomplice liability, one would expect the drafters to have flagged this change instead of remaining silent.

It now appears to us more likely that the drafters of Alaska's code failed to include a provision based on Model Penal Code § 2.06(4) because they considered it superfluous. As explained above, the drafters of the Model Penal Code rejected the common-law decisions that accomplices should automatically be held accountable for any and all objectively foreseeable consequences of a joint unlawful endeavor. Rather, the Model

38. *Echols*, 818 P.2d at 694.

Penal Code's primary philosophical position was that any defendant's culpability should be assessed separately, based on (1) their conduct (either their own personal conduct or the conduct of another for which they were accountable) and (2) their personal culpable mental state(s).

Under Model Penal Code § 2.06(3)—and under AS 11.16.110(2)—a person can be held accountable for *conduct* performed by another person. But no provision of the Model Penal Code imposes vicarious liability for the culpable mental state of another; each person's culpable mental state is evaluated individually. Thus, the drafters of Alaska's code could conclude that, even in the absence of a statutory provision expressly requiring individual assessment of each accomplice's culpable mental state, individual assessment would be the default rule.

This was, in fact, the common-law rule with respect to the participants in a criminal homicide. Take, for instance, the situation where two defendants are jointly accountable for a criminal homicide—one because he personally struck the fatal blow or inflicted the fatal wound, and the other under a theory of complicity because he encouraged or assisted the homicidal act. If one of the defendants acted in cold blood (*i.e.,* with malice aforethought) while the other acted in the heat of passion, the one who acted with malice would be guilty of murder and the one who acted in the heat of passion would be guilty only of manslaughter. This was true regardless of which defendant was the perpetrator and which the accomplice. *See Perkins & Boyce,* pp. 753, 757; *LaFave & Scott,* § 6.7(c), Vol. 2, pp. 144–45.

■ In conclusion: The Model Penal Code was written to impose accomplice liability for crimes involving unintended injury or death if the accomplice intentionally promotes or facilitates the *conduct* that produces the injury or death, even though the accomplice did not intend this result. Among the states that have complicity statutes based on the Model Penal Code, most courts have interpreted their statutes this way. The reasons that we gave in *Echols* for interpreting AS

11.16.110(2) differently do not withstand analysis. Accordingly, we now overrule our decision in *Echols.* When AS 11.16.110(2) speaks of a person's "intent to promote or facilitate the commission of the offense", this phrase means that the accomplice must act with the intent to promote or facilitate the *conduct* that constitutes the *actus reus* of the offense. With respect to offenses that require proof of a particular result, the government must prove that the accomplice acted with the culpable mental state that applies to that result, as specified in the underlying statute.

■ Thus, Riley could properly be convicted of first-degree assault under AS 11.41.200(a)(1) either upon proof that he personally shot a firearm into the crowd or (alternatively) upon proof that, acting with intent to promote or facilitate Portalla's act of shooting into the crowd, Riley solicited, encouraged, or assisted Portalla to do so. These are alternative ways of proving that Riley was accountable for the *conduct* that inflicted the injuries. The government was also obliged to prove that Riley acted with the culpable mental state specified by the first-degree assault statute. But regardless of whether Riley acted as a principal or an accomplice, the applicable culpable mental state remained the same: recklessness as to the possibility that this conduct would cause serious physical injury.[39]

Because Riley's jury was instructed in accordance with *Echols,* they were asked to decide whether the State met a higher burden: proof that Riley intended to inflict serious physical injury. The jury's verdict that Riley acted intentionally with respect to this result is sufficient to establish Riley's guilt under the true standard, "recklessly". See AS 11.81.610(c): "If recklessly suffices to establish an element, that element also is established if a person acts intentionally or knowingly."

For these reasons, we affirm Riley's two convictions for first-degree assault.

*Riley's sentence appeal*

---

**39.** *See* AS 11.41.200(a)(1), which defines the crime as "recklessly caus[ing] serious physical

injury to another by means of a dangerous instrument".

First-degree assault is a class A felony.[40] As a first felony offender, Riley faced a 5-year presumptive term on each of the two counts of first-degree assault, with a maximum sentence of 20 years' imprisonment on each count.[41] For the two counts of first-degree assault and the six counts of third-degree assault, Riley was sentenced to a composite term of 16 years' imprisonment with 6 years suspended—10 years to serve.

Superior Court Judge Niesje J. Steinkruger found that the State had proved three aggravating factors under AS 12.55.155(c): (c)(10)—that Riley's conduct was among the most serious within the definition of first-degree assault; (c)(6)—that Riley's conduct created a risk of injury to three or more persons; and (c)(9)—that Riley knew that the offense involved more than one victim. Judge Steinkruger also found that Riley showed no remorse, was unwilling to accept any blame for his conduct, and lacked insight into his own behavior. She concluded that the need to isolate Riley to protect the public was "extremely high".

In addition to sentencing Riley to serve 10 years in prison, Judge Steinkruger exercised her authority under AS 12.55.115 and ordered that Riley not be eligible for discretionary parole during this 10-year term. She imposed this parole restriction based on her finding that Riley was "an extremely dangerous offender" who, because of his lack of insight and lack of remorse, was unlikely to be rehabilitated before the end of his 10-year term.

Riley contends that his 10-year prison term is excessive. His primary argument is that he was penalized for insisting on a trial. By this, Riley means that his sentence is greater than the sentence that his co-defendant Portalla will likely receive. Portalla entered into a plea bargain with the State, agreeing to plead no contest to a single count of first-degree assault and further agreeing to testify against Riley at his trial.

■ The fact that Portalla may receive a lesser sentence than Riley does not suggest an unjustified sentencing disparity. One obvious justification for the disparate sentences is that Portalla admitted his participation in the assault when he was first questioned by the state troopers, he assisted the troopers in their investigation, and he ultimately agreed to testify for the State—for which he was allowed to plead no contest to a single count of first-degree assault.

In his brief to this Court, Riley asserts that the jury found that Portalla was the one who fired the shots that wounded the two victims. Riley infers this from the fact that the jury found him guilty under a complicity theory. But, as the State points out, the jury's verdict shows only that the jurors could not decide, beyond a reasonable doubt, which man fired the wounding shots—leaving them no alternative but to decide Riley's guilt or innocence under the more stringent requirements of a complicity theory.

Judge Steinkruger's findings at sentencing offer another justification for the disparate sentences. Judge Steinkruger found that Riley, who was 30 years old, was the "leader" in the criminal conduct. (Portalla was 18 years old.) Judge Steinkruger further found that it was Riley's idea to "stalk[ ] a group of young people who were socializing on a summer evening by the river".

As this Court noted in *Sam v. State,* "incidents of unexplained and unprovoked violence may indicate that an offender is seriously disturbed and unusually dangerous. For this reason[,] such conduct may justify the imposition of an exceptionally severe sentence, even for a first offender." 842 P.2d 596, 603 (Alaska App.1992).

For these reasons, we conclude that Riley's 10 year prison term is not clearly mistaken.[42]

■ Riley also contends that Judge Steinkruger did not actually exercise her authority under AS 12.55.115 to restrict his parole eligibility. He asserts that Judge Steinkrug-

---

**40.** AS 11.41.200(b).

**41.** AS 12.55.125(c).

**42.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).

er merely declared that both of his first-degree assault sentences were "presumptive sentences". Riley suggests that the judge may have *thought* that this was sufficient to restrict his parole eligibility for the entire 10–year term, but she was mistaken.

The record does not support Riley's argument. Although Judge Steinkruger never expressly referred to AS 12.55.115, her remarks concerning parole eligibility clearly show that she was exercising her statutory authority to deny Riley discretionary parole during his 10–year prison term:

> *The Court:* [I find] that the defendant is an extremely dangerous offender, shooting into an unarmed crowd.... [B]ased upon the defendant's attitude, ... it [is] unlikely that rehabilitation will occur in less than the full time to serve, as the defendant is without remorse and significant ... insight, and [because he] continues to blame others. I find [his] level of dangerousness to be such that the public needs protection [from him] for the entire term of the sentence, and thus parole eligibility is restricted for the 10 years.

 Finally, Riley challenges Judge Steinkruger's decision to order Riley to pay restitution to one of the shooting victims for the cost of an airplane ticket home. At the time of the assault, this victim was a member of the military, stationed in Fairbanks. Because of the shooting, and because of resulting post-traumatic stress, he was unable to continue to perform his duties. The Army granted him compassionate leave and allowed him to return home to his parents' residence in Ohio to recover.

Alaska Statute 12.55.045 specifically authorizes restitution for "counseling, medical, or shelter services" provided to the "victim or other person injured by the offense". Riley contends that reimbursement for a plane ticket home is beyond the scope of this statutory authorization.

However, in *Reece v. State*, 881 P.2d 1135 (Alaska App.1994), this Court upheld an award of restitution for partial moving expenses incurred by the mother of an eight-year-old sexual abuse victim. We reasoned that the move was "prompted by the sexual abuse for which [the defendant] was convicted and that the location [the mother] chose for a new residence was reasonable." *Id.* at 1138.

The record contains sufficient justification for the victim's move to his parents' residence to recuperate from his injuries. Judge Steinkruger could reasonably conclude that this expense was attributable to Riley's crime and was reimbursable under the statute.

*Conclusion*

For the reasons explained here, our decision in *Echols* is OVERRULED, and Riley's conviction and sentence are AFFIRMED.